# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01718-COA

ADAM HEISINGER

APPELLANT/
CROSS-APPELLEE

v.

PRISCILLA RILEY

APPELLEE/
CROSS-APPELLANT

| | |
|---|---|
| DATE OF JUDGMENT: | 11/14/2016 |
| TRIAL JUDGE: | HON. JERRY G. MASON |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | J. DOUGLAS FORD |
| ATTORNEYS FOR APPELLEE: | LESLIE C. GATES |
| | WILLIAM STACY KELLUM III |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 04/03/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1. Adam Heisinger and Priscilla Riley have a daughter, B.H., who was born in Iowa in 2012. In September 2013, the Iowa District Court for Muscatine County awarded Priscilla and Adam joint legal custody of B.H., awarded Priscilla physical custody, granted Adam visitation, and ordered Adam to pay child support. Priscilla later moved to Mississippi, and in 2015 she petitioned the Lauderdale County Chancery Court to enroll the Iowa judgment,

to suspend and/or modify Adam's visitation, and to increase Adam's child support. Adam answered and filed a counterclaim to enforce the Iowa judgment, to modify custody, and for contempt. A guardian ad litem was appointed based on Priscilla's allegations that Adam had abused or neglected B.H. during his visitation.

¶2. After a trial, the chancellor found that Adam had proven a material change in circumstances, but he denied Adam's petition to modify custody because he found that granting Adam physical custody would not be in B.H.'s best interest. The chancellor also denied Priscilla's petition to modify visitation and increase child support. Finally, the chancellor found Priscilla in contempt for violating prior court orders regarding Adam's visitation, and he awarded Adam attorney's fees.

¶3. On appeal, Adam argues that the chancellor erred by denying his petition to modify custody. Adam also argues that the chancellor's award of attorney's fees was insufficient, and he requests additional attorney's fees for the appeal. On cross-appeal, Priscilla argues that the chancellor erred by finding her in contempt, by denying her request to increase child support, and by finding that she "did not meet her burden of proof with respect to [her allegations of] neglect and abuse."[1]

¶4. In Adam's appeal, we affirm the chancellor's the award of attorney's fees, we award additional attorney's fees for the appeal, and we reverse and remand as to custody for further

---

[1] Priscilla also cross-appealed the chancellor's denial of her request to clarify visitation. However, while this appeal was pending, the chancery court entered an agreed order addressing several issues, including Adam's visitation schedule. This Court directed the parties to address whether the agreed order had rendered moot any issues in this appeal or cross-appeal, and Priscilla responded that the visitation issue is now moot.

proceedings consistent with this opinion, including a new *Albright*[2] analysis.  On cross-appeal, we affirm the chancellor's findings that Priscilla was in contempt and that she had not proven her allegations of neglect and abuse.  However, we reverse and remand on the issue of child support because the chancellor should have applied Mississippi law, rather than Iowa law, to Priscilla's petition to increase the amount of support.

## FACTS AND PROCEDURAL HISTORY

¶5.    Adam and Priscilla met while both were in the military and stationed in Virginia. Adam was an Air Force flight surgeon, and Priscilla was in the Navy.  In 2011, Priscilla discovered she was pregnant and believed that Adam might be the father.  Priscilla later moved to Iowa, and B.H. was born on January 17, 2012.  Adam was deployed overseas at the time of B.H.'s birth.  He returned to the United States in May 2012 and petitioned the Iowa District Court for Muscatine County for DNA testing and a determination of paternity and custody.  Adam was deployed again after he filed the Iowa action, which resulted in some delay in completing the DNA testing.  In May 2013, DNA testing confirmed that Adam was B.H.'s father, and he met B.H. for the first time the following month.

¶6.    In September 2013, the Iowa court entered a decree establishing custody and visitation.  The court awarded Adam and Priscilla joint legal custody, awarded physical custody to Priscilla, and awarded visitation to Adam.  At the time of the decree, Adam's contact with B.H. had been limited, and he was still completing his medical residency in Ohio.  Therefore, the Iowa court set a visitation schedule that would slowly increase B.H.'s

---

[2] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

time with Adam and accommodate his unpredictable work schedule. The court also ordered Adam to pay child support.

¶7. In November 2014, the Iowa court found Priscilla in contempt for denying Adam visitation with B.H. The court sentenced Priscilla to thirty days in jail, which the court suspended on the conditions that Priscilla pay Adam $1,000 in attorney's fees and comply with a new visitation schedule. Adam was granted additional visitation to make up for the time he had lost because of Priscilla's actions. The court also modified Adam's visitation schedule to afford him two weeks of visitation during each eight-week period. The court's order required Adam to give Priscilla notice of the two weeks during which he would exercise visitation in advance of each eight-week period. The order provided that Priscilla could reject Adam's first choice for visitation dates; however, she was not permitted to reject Adam's second choice. The order also established a holiday visitation schedule.

¶8. In August 2015, B.H., who was then three-and-a-half years old, visited Adam at his home in Massillon, Ohio. Adam had to work during at least part of B.H.'s visit, and he left her in the care of a babysitter, Mandy. During B.H.'s visit, Adam noticed a small burn mark on her finger. A few days later, he noticed another mark on her forearm, and when he asked Mandy about the marks, she said that there was another one on B.H.'s buttock. When Adam asked B.H. about the marks, she told him that she had been burned at Priscilla's house on the stove or oven when Priscilla's husband, Shawn, was cooking. Adam decided to take B.H. to the emergency room in order to document the burns, and the doctor who saw B.H. said that the burns were in the later stages of healing. Hospital records reflect that B.H. also told

4

hospital staff that she had been burned at Priscilla's house.

¶9.   Priscilla and Shawn came to Ohio on August 29, 2015, to pick up B.H.  Shawn retrieved B.H. from Adam while Priscilla waited in the car.  Shawn testified that within moments of picking up B.H., he discovered the burn on her finger, then the marks on her arm and buttock.  Priscilla and Shawn asked B.H. about the burns, and she told them that she had been burned at their home in Meridian.  Priscilla decided to take B.H. to the local police department to file a report about the burns.  B.H. also told the police that she had been burned in Mississippi.  Priscilla also took B.H. to the hospital for treatment, and the records from this visit to the hospital are similar to those from her prior visit with Adam.  When Priscilla returned home to Mississippi, she reported her suspicions of neglect or abuse to the Mississippi Department of Child Protective Services (MDCPS).

¶10.   Several weeks later, Adam sent Priscilla a text message to request his next visitation with B.H.  Priscilla rejected the request, supposedly because it would have required B.H. to travel on Halloween.  Adam then re-noticed his visitation for a different date.  In response, Priscilla told Adam that she would not allow him to have any additional visitation until MDCPS completed its investigation of her report.  MDCPS, in coordination with Ohio's child protection agency, investigated Priscilla's report in July 2015 and found that any allegation of abuse was "unsubstantiated."  Nonetheless, on September 25, Priscilla filed a petition in the Lauderdale County Chancery Court to enroll the Iowa judgment and to suspend and/or modify Adam's visitation with B.H.  Priscilla later amended her petition to request an increase in child support.  Priscilla denied all of Adam's subsequent requests for

5

visitation with B.H.

¶11. Adam filed an answer and a counterclaim to enforce the Iowa judgment, to modify custody, and for contempt. On June 2, 2016, because Priscilla's petition alleged that Adam had abused or neglected B.H., the chancellor appointed attorney Frances Stephenson to serve as guardian ad litem (GAL). Because Adam had not seen B.H. since August 2015, the GAL met with B.H. and Adam in her office to observe how B.H. reacted to Adam. The GAL reported that B.H. was uncomfortable around her father, so she recommended that B.H. receive counseling from a child psychologist. The chancellor accepted the GAL's recommendation and ordered B.H. to receive counseling from Dr. Jennifer Whitcomb. The court also ordered the GAL to continue working with B.H., Priscilla, and Adam to determine if and how Adam's visitation with B.H. should proceed.

¶12. Dr. Whitcomb and the GAL determined that B.H. should have visitation with Adam and planned for them to visit briefly in Meridian on Friday, August 5, 2016, followed by an all-day visit on Saturday, August 6. If all went well, B.H. would then go with Adam for a week-long visit in Ohio.

¶13. The visit on August 5 did not start out well. When Priscilla and Shawn brought B.H. to the meeting place, they did not leave immediately, and B.H. became upset. However, Dr. Whitcomb eventually calmed B.H. and persuaded her to go with Adam, and Adam returned B.H. to Priscilla later that evening without further incident.

¶14. The following day, Dr. Whitcomb and the GAL planned to pick up B.H. and then take her to a nail salon to meet Adam. B.H. willingly went with Dr. Whitcomb and the GAL, and

"she was excited about . . . getting her nails done, and that she would be seeing Adam." However, on the way to the nail salon, Dr. Whitcomb and the GAL noticed that Priscilla and Shawn were following their car. Shawn parked across the street from the nail salon at a gas station, and Priscilla later admitted that she hid in a friend's car in a nearby parking lot. The GAL and Dr. Whitcomb left B.H. at the nail salon with Adam after they were convinced that she was comfortable with him.

¶15.   Priscilla later sent the GAL a text message accusing her of not saying "goodbye" to B.H. and having only Adam's interests at heart. Priscilla sent another text message to the GAL asserting that B.H. was "bawling her eyes out" in the nail salon. The GAL realized that Priscilla must have a "spy" inside the salon, which Priscilla later admitted. The GAL knew the salon owner and called him to check on B.H. The owner said that B.H. cried briefly after the GAL departed but was fine.[3] The GAL then called Adam and suggested that he take B.H. to a water park in Choctaw once she finished her manicure. He did so, and he returned B.H. to Priscilla that evening without further incident.

¶16.   B.H. agreed to travel with Adam to his home in Ohio on August 7. B.H. stayed with Adam until August 13, when Priscilla and Shawn came to pick her up. Adam testified at trial that they had a good visit. When Adam had to work, B.H. stayed with a babysitter who had a daughter close to her age. No problems were reported during this visit. B.H. also stayed with Adam for a week in September 2016, and Adam's sister came to Ohio to visit with B.H. and babysit while Adam worked.

_____

[3] Priscilla later called the salon owner and asked him for video of Adam's and B.H.'s visit to the salon, which the owner declined to provide without a subpoena.

¶17.    Adam requested visitation with B.H. while he was in Mississippi for trial in September 2016, but Priscilla refused.  She also refused to allow any post-trial visitation. She told Adam that she would not allow further visitation without a court order.

¶18.    At trial, Priscilla testified that she did not notice any burns on B.H. before Adam's visitation in August 2015.  She claimed that Shawn noticed the burns almost immediately after picking up B.H. in Ohio.  Priscilla acknowledged that B.H. told her and Shawn, the police, and doctors at the hospital in Ohio that she had been burned on the oven or stove at their home in Mississippi.  However, Priscilla denied that B.H. was burned in Mississippi, and she suggested that B.H. may have been coached.  Priscilla also claimed that B.H. told her much later that she had been burned by a cigarette or a lighter.  However, no one else heard B.H. make that claim.  Priscilla testified that although she filed a police report in Ohio, she did not intend for Adam to be named as a "suspect" or an alleged perpetrator of the abuse. Priscilla suspected that Adam's babysitter, Mandy, had burned B.H.  Priscilla faulted Adam for leaving B.H. with Mandy after he discovered the burns.  Priscilla also claimed that she denied Adam visitation after August 2015 in order "to protect B.H. from being harmed further."  Priscilla thought that Adam should only be allowed supervised visitation with B.H. in Mississippi.

¶19.    Adam testified that he first noticed the burn on B.H.'s finger, but it did not concern him initially.  When he later noticed a burn on her arm and Mandy told him about the burn on her buttock, he decided to ask B.H. about them.  B.H. told him that she burned her hand and arm on the stove at home in Mississippi, and she burned her buttock when Shawn was

8

taking something out of the oven. Adam called MDCPS in Mississippi to report what B.H. had told him, and he took B.H. to the hospital to document the burns. Adam said that the burns were healing, so he was not worried about treatment. He denied that B.H. had received the burns while in his or Mandy's care.

¶20. Adam testified that in September 2015, he flew to Mississippi, rented a car, drove to Meridian, and waited for Priscilla to bring B.H. to him at their standard meeting place. He told Priscilla that he was coming and that he had a plane ticket for B.H. to fly back to Ohio with him. Priscilla sent him a text that said, "I told you not to come. I'm not giving her to you." Adam flew back to Ohio the next morning, without B.H. Although he was entitled to visitation with B.H. during Christmas in 2015, Priscilla told him that she would not allow it. Adam testified that he initially bought a plane ticket to come to Mississippi again in December, but he ultimately decided not to make the trip. He testified that when he was finally allowed to resume visitation with B.H. in Ohio, they bonded and had a good time together. B.H. is now very affectionate with him and tells him that she loves him.

¶21. Adam testified that his income will fluctuate over the next few years as he continues his training as an orthopedic surgeon. He did not think that the chancellor should increase his child support because he had paid all court-ordered child support even while Priscilla continued to violate the same court orders. Adam testified that his work schedule varies, but he generally works from 6 or 7 a.m. to 3 p.m. Adam testified that he would work similar hours until he finished his residency in July 2017. He planned to move to Virginia for a one-year fellowship in July 2017.

¶22. Adam acknowledged that B.H. and Priscilla have a close relationship, but he testified that Priscilla was not a good parent because she was trying to force him out of B.H.'s life. Adam maintained that it would be in B.H.'s best interest for him to have physical custody.

¶23. Dr. Whitcomb testified as an expert in marriage, family, and child development. She testified that B.H.'s initial hesitation to visit with Adam was normal for a four-year-old child who had not seen her father for an extended period. Dr. Whitcomb testified that B.H. denied that Adam had ever hurt her in any way. Dr. Whitcomb also testified that Priscilla had cancelled or failed to show up for two of B.H.'s court-ordered counseling sessions. Dr. Whitcomb opined that Priscilla's and Shawn's interference with Adam's relationship with B.H. amounted to "emotional abuse." Dr. Whitcomb was also concerned that Priscilla had tried to coach B.H. to accuse Adam of burning her. B.H. told Dr. Whitcomb that she enjoyed her time with Adam in Ohio, and Dr. Whitcomb had no concerns or reservations about B.H.'s safety with Adam in Ohio.

¶24. The GAL's testimony about Adam's visitation with B.H. in August 2016 was consistent with Dr. Whitcomb's testimony. The GAL interviewed B.H., Adam, Priscilla, and Shawn, reviewed the police reports and hospital records, and found no evidence that Adam had ever harmed B.H. The GAL found that Priscilla had interfered with Adam's visitation intentionally and repeatedly. However, the GAL did not believe that Priscilla's actions were so "extreme" as to warrant a change in custody, and she did not recommend a modification of custody. The GAL recommended that Adam should continue to have regular visitation with B.H. and that B.H.'s pre-kindergarten schedule should not take precedence over

visitation. The GAL also recommended that the chancellor enjoin Priscilla from interfering with Adam's visitation in any way.

¶25. On November 14, 2016, the chancellor entered a thirty-eight page memorandum opinion and a separate final judgment. The chancellor found that Priscilla did not prove by a preponderance of the evidence that Adam abused or neglected B.H. Therefore, he denied her petition to suspend visitation or to require supervised visitation. The chancellor also denied her request to modify or clarify Adam's visitation under the Iowa visitation schedule. The chancellor also denied Priscilla's petition to increase child support.

¶26. The chancellor found that Priscilla had "unreasonably, irresponsibly and willfully" violated the Iowa decree by refusing multiple visitation requests by Adam. He also noted her "irresponsible" behavior during the August 2016 visitation in Meridian. The chancellor found that Adam had shown by clear and convincing evidence that Priscilla was in contempt, and he ruled that Priscilla's conduct warranted incarceration. However, he suspended her incarceration on the conditions that she comply with the Iowa court's orders, grant Adam specified holiday visitation, pay GAL fees, pay Adam $1,950 in attorney's fees, and continue to take B.H. to Dr. Whitcomb for counseling.

¶27. The chancellor also found that Adam had shown by a preponderance of the evidence that a material change in circumstances had occurred relative to B.H.'s custody—namely, Priscilla's persistent interference with Adam's visitation and relationship with B.H. The chancellor also found that this change had been adverse to B.H.'s welfare. He found that Adam and B.H. had a good relationship until August 2015, but Priscilla's subsequent refusal

11

to allow visitation undermined the relationship and B.H.'s affections for her father. However, after applying the *Albright* factors, the chancellor found that it was in B.H.'s best interest to remain in Priscilla's physical custody.

¶28.   On appeal, Adam argues that the chancellor erred by not modifying custody after finding there had been a material, adverse change in circumstances.   Adam also argues that the chancellor abused his discretion in awarding only $1,950 in attorney's fees, and he requests additional attorney's fees for the appeal.   On cross-appeal, Priscilla argues that the chancellor erred by finding her in contempt, by denying her petition to increase child support, and by finding that she failed to prove her allegations of abuse and neglect.   We address these issues in turn below.

**ANALYSIS**

### I.   Custody

¶29.   "To modify child custody, 'the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interest mandates a change of custody.'" *Strait v. Lorenz*, 155 So. 3d 197, 203 (¶20) (Miss. Ct. App. 2015) (quoting *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1013 (¶24) (Miss. 2012)).   "The chancellor must consider the 'totality of the circumstances.'" *Id.* (quoting *A.M.L.*, 98 So. 3d at 1013 (¶24)). "If an adverse substantial or material change is found, the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Id.*

¶30. On appeal, a chancellor's findings of fact will be affirmed "if they are supported by substantial, credible evidence." *Id.* at (¶19) (quoting *A.M.L.*, 98 So.3d at 1013 (¶23)). "Matters involving child custody are within the sound discretion of the chancellor." *Id.* We will not reverse the chancellor's custody decision "unless the chancellor abused his discretion, was manifestly wrong, or clearly erroneous, or applied an erroneous legal standard." *Id.*

¶31. In general, one parent's interference with the other's visitation is not, by itself, a reason to modify custody. *See id.* at (¶21). Noncompliance with visitation orders should be dealt with through contempt rather than a change of custody. *Id.* at 203-04 (¶21). However, in "extraordinary circumstances," severe interference with visitation may amount to a material change in circumstances. *Id.* at 204 (¶21).

¶32. The chancellor found that Priscilla's willful and extensive interference with Adam's visitation and relationship with B.H. was a material change in circumstance because of the harm it had done to Adam's relationship with B.H. The chancellor's finding of a material change in circumstances is supported by substantial, credible evidence. Moreover, Priscilla does not directly challenge this finding on appeal.

¶33. Having found a material change in circumstances, the chancellor was required to conduct an *Albright* analysis. *See Strait*, 155 So. 3d at 203 (¶20). The chancellor found that the "best parenting skills factor favors Adam." However, the chancellor found that the employment and employment responsibilities factor favors Priscilla because she is a stay-at-home mother for B.H. (and her two other children), whereas Adam is a busy orthopedic

13

surgery resident and lives alone. The chancellor also found that the continuity of care, emotional ties, and stability of home environment factors favor Priscilla. The chancellor found all other factors to be neutral or inapplicable. Having "considered the evidence relevant to the *Albright* factors," the chancellor found that it was "in the best interest of [B.H. to] remain within the custody of Priscilla."

¶34. On appeal, Adam argues, *inter alia*, that the chancellor erred by finding that continuity of care and emotional ties favored Priscilla. He argues that by weighing these factors in Priscilla's favor, the chancellor permitted Priscilla to benefit from her own misconduct. Adam argues that the chancellor's decision was inconsistent with this Court's decisions in *Strait*, *supra*, and *Story v. Allen*, 7 So. 3d 295 (Miss. Ct. App. 2008).

¶35. In *Story*, the chancellor found that the child had "been with her mother most of her life" and that her separation from her father was "due to [the mother's] conduct"—i.e., she had "repeatedly interfered" with the father's relationship and visitation with the child. *Id.* at 298 (¶21). The chancellor then found that the "continuity of care factor" favored the mother. *Id.* On appeal, this Court reversed, stating:

> It is neither logical nor proper to favor one of the parents, under an *Albright* factor, because of that parent's malfeasance. . . . *Equity dictates that the chancellor should have at least found this factor to be neutral.* Therefore, we find that the chancellor committed manifest error with regard to the analysis of the continuity of care.

*Id.* at 298-99 (¶21) (emphasis added).

¶36. The chancellor in *Story* similarly found that the emotional ties factor "slightly favor[ed]" the mother, but this was in part because the mother had undermined the child's

14

relationship with the father. This Court reversed on this issue as well, stating:

> Again, we find that [it] is not logical or proper to reward [the mother's] interference with [the father's] relationship with [the child]. *Again, equity dictates that the chancellor should have at least found this factor to be neutral.* Therefore, we find that the chancellor committed manifest error with regard to the analysis of the emotional ties of the parent and child.

*Id.* at 299 (¶22) (emphasis added); *accord Strait*, 155 So. 3d at 207-08 (¶¶39-40, 44).

¶37. In the present case, when the chancellor found that the continuity of care factor favored Priscilla, he reasoned as follows:

> Priscilla has had the care of B.H. since the child was born and she has had the primary care of B.H. since September 2013. Of course, she has had more care for B.H. than anticipated [since] September 2013 because she has denied Adam visitation. This Court finds that the continuity of care factor favors Priscilla as the custodial parent.

¶38. As to the emotional ties factor, the chancellor's reasoning was similar:

> Related to the continuity of care factor is the emotional ties of the parent and child factor. B.H. has stronger emotional ties with Priscilla than she has with Adam. However, Priscilla interfered with Adam's development [of] emotional ties with B.H. when she refused and interrupted his visitation with B.H. This Court finds that the emotional ties of the parent and child factor favor Priscilla as the custodial parent, but Priscilla's refusal and interruption with Adam's visitation diminishes the significance of this factor.

¶39. The chancellor's analysis in this case is similar to the analysis that was the basis for reversal in *Story*. Although the chancellor in this case did acknowledge that these factors favored Priscilla because of her own misconduct, the same can be said of the chancellor in *Story*. *See Story*, 7 So. 3d at 298-99 (¶¶21-22). In addition, the chancellor did state that Priscilla's misconduct "diminishes the significance" of the emotional ties factor to some unstated extent. However, in *Story*, this Court held that "equity dictates that the chancellor

15

should have at least found this factor to be neutral." *Id.* at 299 (¶22). As to both the continuity of care and emotional ties factors, the chancellor's ruling is inconsistent with this Court's holding in *Story*. These factors may not be weighed in favor of Priscilla to any degree because "equity dictates" that she not benefit from her own misconduct.

¶40. Moreover, we cannot say that this error was harmless. The error relates to two important *Albright* factors in a case in which the evidence could have supported a different ruling and a modification of custody. Accordingly, as in *Story*, we find that the chancery court manifestly erred and that the issue of custody must be reversed and remanded for further proceedings and a new *Albright* analysis. *See id.* at 298-99 (¶¶20-23).

¶41. Adam also argues that the chancellor should have modified custody because "Priscilla's behavior poses a clear danger to the mental or emotional health of B.H." Adam argues the chancellor did not give sufficient consideration to Priscilla's unproven allegations of abuse or neglect. Finally, Adam argues that the chancellor erred by finding that the stability of home environment and employment responsibilities factors favored Priscilla and by finding the mental health factor to be neutral. He argues that for all these reasons, we should reverse and render a decision awarding him physical custody of B.H.

¶42. We disagree with these broader arguments. Despite Priscilla's misconduct, the evidence does not compel a finding that she is a "clear danger" to her daughter. In addition, while the chancellor found that Priscilla's allegations of abuse were not proven, the evidence as to the cause of B.H.'s burns was conflicting and indeterminate, as was the evidence of Priscilla's motivations and good faith, or lack thereof, in alleging that the burns occurred

16

while B.H. was in Adam's care. Finally, we do not find any manifest error in the chancellor's application of the remaining *Albright* factors.

¶43.    In a custody case, "the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). We review the chancellor's decision for manifest error, giving deference to the weight that he assigned each factor. *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016). We do not "second guess" the chancellor's ultimate decision in the absence of some legal or manifest error. *Irle v. Foster*, 176 So. 3d 25, 31 (¶26) (Miss. Ct. App. 2013), *aff'd*, 175 So. 3d 1232 (Miss. 2015). Therefore, although we must reverse and remand the case for further proceedings and a new *Albright* analysis, we will not substitute our judgment for the chancellor's by rendering a final custody decision.

## II.    Attorney's Fees

¶44.    The chancellor awarded Adam $1,950 in attorney's fees for Priscilla's contempt. Adam argues that this award was insufficient because he actually incurred at least $35,000 in attorney's fees. At trial, Adam's attorney attempted to "call [him]self" as a witness "[t]o testify about attorney's fees." Priscilla objected on the ground that Adam had not listed his attorney as a witness in the pretrial order, and the chancellor sustained the objection. Adam then testified about his attorney's fees and attempted to offer his attorney's invoices into evidence. Priscilla objected on the ground that Adam had not listed the invoices as a trial exhibit in the pretrial order, and the chancellor sustained the objection. Adam's attorney then simply asked him, "[D]o you know how much you have incurred in attorney's fees and

17

expenses?" Adam stated, "I know it's more than $35,000." In the final judgment, the chancellor awarded Adam fees of $1,950, payable in monthly installments of $100.[4]

¶45. "The matter of awarding attorney's fees is largely entrusted to the sound discretion of the chancellor." *Evans v. Evans*, 75 So. 3d 1083, 1089 (¶22) (Miss. Ct. App. 2011) (citing *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982)). "When a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Gregory v. Gregory*, 881 So. 2d 840, 846 (¶28) (Miss. Ct. App. 2003). "Fees awarded on this basis, though, should not exceed the expense incurred as a result of the contemptuous conduct." *Roberts v. Roberts*, 110 So. 3d 820, 828 (¶23) (Miss. Ct. App. 2013) (quoting *Evans v. Evans*, 75 So. 3d 1083, 1089 n.8 (Miss. Ct. App. 2011)). That is, fees incurred litigating other matters—such as custody modification or child support—are not recoverable based on the contempt.

¶46. In addition, "[o]ur well-established standard for reviewing the trial court's admission or suppression of evidence is abuse of discretion, and the discretion possessed by a trial court in such matters is no doubt great." *Beverly Enterprises Inc. v. Reed*, 961 So. 2d 40, 44 (¶18) (Miss. 2007). We also hold, as federal courts have held repeatedly, that a trial judge "has broad discretion in deciding whether to admit into evidence exhibits not listed in the pre-trial

[4] After the final judgment, Adam filed an amended petition for contempt, alleging that Priscilla continued to deny him court-ordered visitation. The chancery court's subsequent agreed order, discussed in footnote 1, *supra*, provided that "Adam's claims and allegations of contempt against Priscilla [would be] held in abeyance indefinitely subject to being later asserted and/or heard." The agreed order also required Priscilla to pay Adam "the total sum of [$3,000] to reimburse [him] for fees and expenses incurred related to this matter."

order." *Gilbert v. Tulane Univ.*, 909 F.2d 124, 127 (5th Cir. 1990) (citing *Robert v. Conti Carriers & Terminals Inc.*, 692 F.2d 22, 24 (5th Cir. 1982)); *see* M.R.C.P. 16 (discussing pretrial conferences and pretrial orders); *Lirette v. Popich Bros. Water Transp. Inc.*, 660 F.2d 142, 144 (5th Cir. 1981) (holding that the trial judge has "broad discretion" to exclude witnesses not listed on the pretrial order); *U.S. v. First Nat'l Bank of Circle*, 652 F.2d 882, 886 n.5 (9th Cir. 1981) ("Exclusion by the trial court of . . . evidence not listed in . . . the pretrial order has been repeatedly upheld." (collecting cases)).

¶47. Applying these principles, we cannot say that the chancellor committed any abuse of discretion in connection with the issue of attorney's fees. The chancellor could have allowed Adam's attorney to testify or admitted the invoices, but he was within his discretion to sustain Priscilla's objections to evidence not listed on the pretrial order. Therefore, the only evidence to support Adam's request for attorney's fees was his own testimony that he had incurred more than $35,000 in fees. It is unclear whether this amount includes litigation in Iowa or is limited to fees incurred in Mississippi. More important, Adam's testimony was not limited to fees incurred as a result of Priscilla's contempt. As noted above, Adam was not entitled to recover *all* of his attorney's fees. Specifically, he was not entitled to recover any fees in excess of those that he "incurred as a result of the contemptuous conduct." *Roberts*, 110 So. 3d at 828 (¶23) (quoting *Evans*, 75 So. 3d at 1089 n.8). Thus, Adam was not entitled to fees that he would have incurred anyway litigating issues of custody, which was the primary issue in this case, or child support. With no specific evidence as to the amount of fees that Adam incurred because of Priscilla's contempt, the chancellor did not

19

abuse his discretion by awarding attorney's fees of $1,950. *See* Miss. Code Ann. § 9-1-41 (Rev. 2014) ("In any action in which a court is authorized to award reasonable attorneys' fees, the court [may] make the award based on the information already before it and the court's own opinion based on experience and observation . . . .").

¶48.   In his brief on appeal, Adam also requests an "appropriate" award of appellate attorney's fees.  Such an award is appropriate in this case because Priscilla cross-appealed the chancellor's finding of contempt, and for the reasons discussed below, we affirm on that issue. *See Riley v. Riley*, 196 So. 3d 1159, 1164-66 (¶¶23-32) (Miss. Ct. App. 2016) (holding that an award of appellate attorney's fees is appropriate when the chancellor awarded fees based on a finding of contempt and the recipient must defend the finding on appeal). Therefore, we award appellate attorney's fees of $975, or one half of the attorney's fees awarded by the trial court. *See id.* at 1164 (¶23) ("Generally, on appeal this Court awards attorney's fees of one-half of what was awarded in the trial court."); *accord Grant v. Grant*, 765 So. 2d 1263, 1268 (¶19) (Miss. 2000).

### III.   Contempt

¶49.   The chancellor found Priscilla in contempt for denying Adam visitation on multiple occasions in 2015.  The chancellor found that Priscilla's actions intentionally violated the Iowa court's visitation order, which had been enrolled in the chancery court.  On appeal, Priscilla argues that the chancellor erred.  However, Priscilla's argument is based on frivolous interpretations of the Iowa order.  For example, that order required Adam to notify Priscilla of visitation dates "two (2) weeks before the beginning of each (8) week period."

Priscilla now argues that this required Adam to give notice *exactly* two weeks prior to the eight-week period so that when Adam provided notice *fifteen days* in advance, his notice was *too early* and invalid. Priscilla argues that she was free to *ignore* such notice because it was premature. Priscilla never disclosed her novel interpretations of the Iowa order until her brief on cross-appeal. She did not raise these issues when she denied Adam visitation, nor did she offer this defense at trial. Indeed, Priscilla admitted at trial that she had violated the Iowa order. There was ample evidence to support the chancellor's finding that Priscilla willfully violated the Iowa order by denying Adam visitation on multiple occasions.[5]

## IV. Child Support

¶50. In September 2013, the Iowa court found that Adam's "gross" "salary" was $45,000 per year and ordered him to pay child support of $596.35 per month until B.H. reaches the age of eighteen or is emancipated. Priscilla petitioned the chancery court to increase child support, alleging that Adam's income and B.H.'s expenses had increased. The chancellor denied Priscilla's petition because he found that she failed to "develop the factors relevant to the modification of child support under the law of the issuing Court"—i.e., under Iowa law. We conclude that the chancellor erred because the issue should have been decided under Mississippi law.

¶51. The chancellor's opinion correctly quoted the relevant provisions of the Uniform

---

[5] Priscilla makes a separate argument that the chancellor erred by "sanctioning [her] for violating the [GAL's] visitation orders." However, the chancellor found her in contempt because she violated prior *court* orders, not any "orders" of the GAL. Nor did the chancellor impose "sanctions" on Priscilla for her failure to cooperate with the GAL. The chancellor simply discussed her behavior as further evidence of her ongoing efforts to interfere with Adam's visitation. The chancellor did not err by doing so.

Interstate Family Support Act, as adopted by the Mississippi Legislature:

> (b) Modification of a registered child-support order is subject to the same requirements, procedures and defenses that apply to the modification of an order issued by a tribunal of this state and the order may be enforced and satisfied in the same manner.

> (c) A tribunal of this state may not modify any aspect of a child-support order that may not be modified under the law of the issuing state, including the duration of the obligation of support. . . .

Miss. Code Ann. § 93-25-611(b)-(c) (Supp. 2017).

¶52.    In *Nelson v. Halley*, 827 So. 2d 42 (Miss. Ct. App. 2002), we interpreted the language that is now found in subsection (c), above.  *See id.* at 51 (¶¶33-35).[6]  In *Nelson*, the chancellor modified a California support order to extend the duration of the father's duty of support until his children reached the age twenty-one.  *See id.* at (¶33).  On appeal, this Court held that what is now subsection (c), above, prohibited the modification because the California order terminated the father's support obligations when his children reached the age of eighteen or nineteen, and that aspect of the California order was not modifiable under California law.  *See id.* at (¶¶33-35).  Therefore, we reversed the modification.  *Id.* at (¶35).

¶53.    The issue in this case is different.  Priscilla did not seek to modify any aspect of the Iowa court's order that was non-modifiable under Iowa law.  Her request to modify the amount of support based on alleged increases in Adam's income and B.H.'s expenses is governed by subsection 93-25-611(b), which provides that "[m]odification of a registered

---

[6] When *Nelson* was decided, subsection (c) did not include the clause, "including the duration of the obligation of support."  *See Nelson*, 827 So. 2d at 51 (¶34).  That language, which effectively codifies *Nelson*'s holding, was added in 2004.  *See* 2004 Miss. Laws ch. 406, § 33.

child-support order is subject to the same requirements, procedures and defenses that apply to the modification of an order issued by a tribunal of *this state*." Under subsection (b), a Mississippi chancery court should apply Mississippi law and child support guidelines to a request to modify the amount of child support payable. Deborah H. Bell, *Mississippi Family Law* § 18.08[4][b], at 573 (2d ed. 2011); *see, e.g.*, *C.K. v. J.M.S.*, 931 So. 2d 724, 728-31 (Ala. Ct. Civ. App. 2005) (holding that under the parallel choice-of-law provisions of Alabama's uniform act, the duration of the support obligation could not be modified because it was non-modifiable under the law of the "issuing state," Mississippi, but Alabama law and guidelines controlled any request to modify the amount of support payable); *Groseth v. Groseth*, 600 N.W.2d 159, 164-69, 171 (Neb. 1999) (reaching the same conclusions under Nebraska law); *In re Marriage of Cooney*, 946 P.2d 305, 307 (Or. Ct. App. 1997) (reaching the same conclusions under Oregon law).

¶54.    The chancellor denied Priscilla's request to modify child support because she failed to prove that an increase in support was warranted under Iowa law. This was error, as the issue is governed by Mississippi law. Therefore, we reverse and remand for the chancellor to consider Priscilla's petition to modify child support under Mississippi law.[7]

## V.    Priscilla's Allegations of Abuse and Neglect

¶55.    On cross-appeal, Priscilla also argues that the chancellor "erred in finding that [she] did not meet her burden of proof with respect to neglect and abuse." Her brief addresses the issue in only two sentences and simply notes that the burns were discovered while B.H. was

---

[7] Of course, if there is a change of custody, reconsideration of Priscilla's petition will be unnecessary.

in Ohio. The issue is waived due to Priscilla's failure to brief it. *See* M.R.A.P. 28(a)(7); *In re Estate of Smith v. Boolos*, 204 So. 3d 291, 313 (¶49) (Miss. 2016).

¶56. The issue is also without merit. B.H. consistently told Adam, Priscilla, Shawn, the police, doctors, and others that she was burned in Mississippi, not in Ohio. Adam adamantly denied that he had ever neglected or abused B.H. MDCPS found that any allegation of abuse or neglect was "unsubstantiated." And the GAL and Dr. Whitcomb also found no evidence of abuse. Suffice it to say, there was substantial, credible evidence to support the chancellor's finding that Adam did not abuse or neglect B.H.

**CONCLUSION**

¶57. We affirm the chancellor's finding of contempt, his finding that Adam did not abuse or neglect B.H., and his award of attorney's fees to Adam. We also order Priscilla to pay Adam additional attorney's fees of $975 because Adam had to defend the chancellor's finding of contempt on appeal.

¶58. For the reasons discussed above, we reverse and remand as to Priscilla's petition to modify child support for the chancellor to apply Mississippi law. The issue of child support should be determined based on "current circumstances" on remand. *Wheat v. Wheat*, 37 So. 3d 632, 643 (¶42) (Miss. 2010).

¶59. We also reverse on the issue of custody and remand for further proceedings consistent with this opinion, including a new *Albright* analysis. It has been more than a year and a half since the prior hearing. Therefore, as with the issue of child support, the chancellor should base his decision on the best interest of the child and the circumstances as they exist "at the

24

time of the remand hearing." *Vaughn v. Davis*, 36 So. 3d 1261, 1267 (¶18) (Miss. 2010).

¶60. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. BARNES AND FAIR, JJ., NOT PARTICIPATING.**