# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01305-COA

**TIFFANY BELLVILLE SMITH**                                **APPELLANT**

**v.**

**NATHAN TRENT BELLVILLE**                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/08/2018 |
| TRIAL JUDGE: | HON. DEBORAH J. GAMBRELL |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | TERRY L. CAVES |
| | RISHER G. CAVES |
| ATTORNEY FOR APPELLEE: | S. CHRISTOPHER FARRIS |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 03/24/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., GREENLEE AND LAWRENCE, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1. This appeal concerns a modification of child custody. Tiffany Smith appeals from the judgment of the Lamar County Chancery Court, claiming (1) the chancellor applied an erroneous legal standard in awarding sole physical custody to Nathan Bellville, and (2) the chancellor abused her discretion by finding that it was in the child's best interest to award sole physical custody to Nathan. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On April 13, 2015, the Lamar County Chancery Court awarded Nathan a divorce from Tiffany on the grounds of uncondoned adultery. Both parties agreed to joint legal and

physical custody of their child, B.B.[1]  At the time, Nathan and Tiffany both lived in Lamar County and agreed to week-to-week physical custody with exceptions for holidays.

¶3.    After the divorce, Tiffany married Danny Smith in June 2015 and gave birth to triplets in April 2017.  In April 2018, Danny informed Nathan that his job required him to relocate from Hattiesburg to Tupelo, which was approximately 250 miles away.  Subsequently, on April 23, 2018, Nathan filed a petition for modification of custody.  Nathan asserted that the move would make the joint physical-custody arrangement "impractical and difficult to maintain."  And he requested that the court modify custody to provide him with sole physical custody of B.B.

¶4.    In May 2018, Tiffany filed an answer and a counterclaim.  In the counterclaim, Tiffany admitted that joint physical custody would not be feasible once she moved to Tupelo.  However, she asserted that Nathan's "parenting skills and bizarre behaviors" constituted a material change in circumstances that adversely affected B.B.  Tiffany alleged, among other things, that Nathan allowed B.B. to play Call of Duty; use a hammer; carry a machete and firearms; and ride in the car without safety restraints.  She also alleged that Nathan had chased B.B. while riding a four-wheeler.  Tiffany requested that the court modify custody to provide her with primary physical custody of B.B.

¶5.    On August 7, 2018, the chancellor entered an Opinion and Final Judgment, which was amended on August 8, 2018.  The chancellor found that the Smiths' move to Tupelo was a material change in circumstances that would render the joint physical custody arrangement

---

[1] We use initials to protect the identity of the minor child.

2

impractical or impossible. The chancellor then conducted an *Albright*[2] analysis and found that it would be in B.B.'s best interest to award Nathan sole physical custody and Tiffany liberal visitation.

¶6. Subsequently, Tiffany filed a "Rule 59 Motion for a New Trial or to Alter or Amend the Final Judgment or[,] in the alternative[,] [a] Rule 52 Motion to Amend Findings and Judgment."[3] After Nathan filed a response to the motion and argument was heard, the chancellor entered an order denying Tiffany's post-trial motion as it pertained to physical custody.

¶7. On appeal, Tiffany claims that (1) the chancellor applied an erroneous legal standard in awarding sole physical custody to Nathan, and (2) the chancellor abused her discretion by finding that it was in B.B.'s best interest to award sole physical custody to Nathan.

**STANDARD OF REVIEW**

¶8. This Court will affirm a chancellor's findings of fact "if they are supported by substantial, credible evidence." *Heisinger v. Riley*, 243 So. 3d 248, 256 (¶30) (Miss. Ct. App. 2018) (quoting *Strait v. Lorenz*, 155 So. 3d 197, 203 (¶19) (Miss. Ct. App. 2015)). "Matters involving child custody are within the sound discretion of the chancellor." *Id*. This Court "will not reverse the chancellor's custody decision unless the chancellor abused [her] discretion, was manifestly wrong, or clearly erroneous, or applied an erroneous legal standard." *Id*. at 256-57 (¶30) (internal quotation marks omitted).

---

[2] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

[3] *See* M.R.C.P. 59; M.R.C.P. 52.

3

¶9. As a preliminary matter, we note that Tiffany filed her opening brief on April 16, 2019. On July 19, 2019, Nathan filed his appellee's brief. On September 4, 2019, Tiffany filed her reply brief, as well as a motion to strike Nathan's brief. The motion was passed for consideration with the merits of the appeal by order of this Court.

¶10. In Tiffany's motion to strike, she argues that this Court should strike Nathan's brief for failure to cite the record and, with regard to section II of Nathan's brief, failure to cite authority. M.R.A.P. 28(a)(7), (f). She also argues that the brief contains misstatements of fact, mischaracterizations of the evidence, conclusions of counsel, and unsupported facts. In her reply brief, she argues that because Nathan failed to comply with Rule 28(a)(7), this Court should, by default, reverse and render the chancellor's custody determination.

¶11. In response to the motion to strike, Nathan argues that his brief responds to Tiffany's arguments and relies on the chancellor's analysis, which is part of the appellant's record excerpts. Nathan further asserts that Tiffany's motion is frivolous and that he should be awarded $500 in attorney's fees.

¶12. The motion to strike and the request for sanctions are denied. While Rule 28(a)(7) requires citations to authority and parts of the record relied on, there is no provision in our rules for striking a brief for failure to do so. Rather, the failure to provide proper citations may render an argument procedurally barred. *Reel v. Warren*, 232 So. 3d 736, 738 n.2 (Miss. Ct. App. 2017). Regardless, any statements that lack support in the record will be disregarded by this Court, as this Court "will consider only those matters that actually appear

in the record and does not rely on mere assertions in briefs." *Touchstone v. Touchstone*, 682 So. 2d 374, 380 (Miss. 1996). We further decline to reverse and render the chancellor's decision based on the alleged deficiencies in Nathan's brief. We now address the merits of Tiffany's appeal.

**I.      Whether the chancellor applied an erroneous legal standard in awarding sole physical custody to Nathan.**

¶13.    "To modify child custody, 'the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interest mandates a change of custody.'" *Heisinger*, 243 So. 3d at 256 (¶29) (quoting *Strait*, 155 So. 3d at 203 (¶20)). "The chancellor must consider the 'totality of the circumstances.'" *Id*. And "[i]f an adverse substantial or material change is found, the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Id*.

¶14.    Tiffany does not dispute that there was a material change in circumstances, but she claims that the chancellor applied an erroneous legal standard in awarding sole physical custody to Nathan. Specifically, Tiffany argues that the chancellor did not make the custody determination based on the child's best interest but instead on who "lived up to" the initial custody agreement. Tiffany cites to *Bell v. Bell*, 572 So. 2d 841 (Miss. 1990), for the proposition that a custody agreement that requires a parent to live in a certain location is unenforceable. And she argues that the chancellor imputed such a term into the initial custody agreement and punished her for moving by awarding sole physical custody to Nathan.

5

¶15.    A review of the record shows that during the trial the chancellor was reluctant to modify custody.  She explained that she had encountered too many parties who agreed to joint custody "just to get what they need[ed,] when they want[ed] it."  The chancellor asked why Nathan and Tiffany initially agreed to joint physical custody, and Tiffany's attorney responded that there were "a lot of reasons."  However, Nathan's attorney stated that when the divorce on the grounds of uncondoned adultery was pending, Nathan was "pursuing full custody" of B.B.  The chancellor then stated, "I know that when I have a divorce on grounds and the parties come in and they agree and they do it - - and I don't know why they do it because they feel they might lose or whatever.  Then they come back within five years wanting to change it, I have difficulties with that."  The chancellor further stated, "[T]his [c]ourt does not like it when people . . . enter into an agreement to keep one party from getting paramount physical custody . . . without anticipating what your ages are[,] . . . what your jobs are, [and] your abilities to move.  And then you come back to me and say, oh, well, I moved and I want to change things."

¶16.    From the bench, the chancellor discussed enforcing the initial custody agreement until B.B. was in the first grade and repeatedly stated that Nathan and Tiffany would have to "figure out how to make [joint custody] work."[4]  However, when the chancellor entered her written "Opinion and Final Judgment," the chancellor found that the move was a material change in circumstances and, after conducting an *Albright* analysis, found that it would be in B.B.'s best interest to award sole physical custody to Nathan.

---

[4] At the time, B.B. had completed kindergarten, but his teacher suggested that he be enrolled in a transition class before entering the first grade.

6

¶17. At the hearing on Tiffany's post-trial motion, the chancellor expressed her belief that joint physical custody "is impossible in today's society." Additionally, she stated that joint physical custody was not in a child's best interest because children become "victims" who "live with the backpack[s] on their back[s]." But the chancellor noted that Nathan and Tiffany initially agreed to joint physical custody and that she would have to determine how to make them "live up to" that agreement. But later, the chancellor stated several times that it was her responsibility to determine the best interest of the child, and she declined to enforce the initial joint physical-custody agreement. Rather, the final judgment, which awarded sole physical custody to Nathan, remained in place.

¶18. Although the chancellor made various remarks throughout the proceedings, the chancellor ultimately concluded that her decision must be based on the best interest of the child and conducted an *Albright* analysis before finding that it was in B.B.'s best interest to award sole physical custody to Nathan. Accordingly, we conclude that the chancellor did not apply an erroneous legal standard in awarding sole physical custody to Nathan.

**II.      Whether the chancellor abused her discretion by finding that it was in the child's best interest to award Nathan sole physical custody.**

¶19. Tiffany claims the chancellor abused her discretion by finding that an award of sole physical custody to Nathan was in B.B.'s best interest.

¶20. In any child custody case, the "polestar consideration . . . is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. The chancellor must consider the following factors: (1) age, health, and sex of the child; (2) which parent had "continuity of care prior to the separation"; (3) parenting skills; (4) "willingness and capacity to provide

7

primary child care"; (5) both parents' employment responsibilities; (6) "physical and mental health and age of the parents"; (7) emotional ties between parent and child; (8) moral fitness; (9) "the home, school and community record of the child"; (10) the child's preference, if the child is at least twelve years old;[5] (11) the "stability of [the] home environment and employment of each parent"; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Id.*

¶21.     This Court has held that "[t]he chancellor must address each factor that is relevant to the case, but she does not have to decide that each factor favors one parent or the other." *Sanders v. Sanders*, 281 So. 3d 1043, 1050 (¶23) (Miss. Ct. App. 2019) (citing *Harden v. Scarborough*, 240 So. 3d 1246, 1251 (¶11) (Miss. Ct. App. 2018)).  "Nor does *Albright* require that 'custody must be awarded to the parent who wins the most factors.'" *Id.*  Instead, "the chancellor is simply required to address and consider the relevant factors in determining what custody arrangement would be in the child's best interest." *Id.*  "We review the chancellor's application of the factors for manifest error, giving deference to the weight [she] assigned each factor." *Id.*

¶22.     Tiffany claims the chancellor misapplied several factors.  Specifically, she contends that the chancellor erroneously found that the age,-health,-and-sex-of-the-child and moral-fitness factors favored Nathan.  She also contends the chancellor erroneously found the employment responsibilities of the parents was a neutral factor.  And she believes the chancellor did not place enough weight on the parenting-skills and continuity-of-care factors.

---

[5] *See Sanders v. Sanders*, 281 So. 3d 1043, 1050 (¶22) (Miss. Ct. App. 2019).

8

Finally, she claims the chancellor abused her discretion by separating B.B. from his three half-siblings.

### A. Age, Health, and Sex of the Child

¶23. Tiffany claims the chancellor abused her discretion by finding that the age, health, and sex of the child favored Nathan. Specifically, Tiffany argues that Nathan's allegation that B.B. suffered from anxiety was not credible.

¶24. In the amended opinion and final judgment, the chancellor made the following findings:

> [B.B.] is a 6 year old male child. Nathan testified that going back and forth between Hattiesburg and Tupelo has made [B.B.] anxious. [B.B.]'s Kindergarten teacher (this past school year) said that [B.B.] did seem to show some anxiety on the weeks he was away from his dad (but that [B.B.] has a good relationship with both parents). Tiffany testified that [B.B.'s] teachers have never mentioned anxiety to her and that [B.B.] is never anxious or upset when he goes to Tupelo.

¶25. Ultimately, the chancellor found that this factor favored Nathan. The chancellor heard both Nathan and B.B.'s teacher testify that B.B. had anxiety. "In cases such as this, it is the role and duty of the chancellor to make such credibility determinations . . . ." *Id*. at 1051 (¶27). After reviewing the record, we conclude that substantial evidence supports the chancellor's finding that this factor favored Nathan.

### B. Continuity of Care

¶26. With respect to which parent had the continuity of care, the chancellor found that prior to the petition for modification, Nathan and Tiffany had joint physical custody. The chancellor also made the following findings:

> Nathan described [his] and [B.B.]'s routine, things they did for fun, etc.

9

During the first year following the divorce, [B.B.] was 3-4 years old, Nathan's work hours were such that his parents got [B.B.] up in the morning, took him to school, picked him up 3 days a week (or stayed with him all day), and Nathan got home at 5:15 p.m. during the school year. During the next year - [B.B.] went to school every day, and Nathan's parents continued to assist Nathan.

Nathan admitted that [B.B.] has spent more time with Tiffany since the divorce than him (because she was a stay at home mom and he has worked full time).

After [the] divorce, when [B.B.] has been with Tiffany, she testified that she took him to school (except when he carpooled in K5) and picked him up, then kept him in the afternoon, and that it was just her and him during the day for two years (before her triplets were born in 2017). She said she always took him to the doctor unless he happened to be sick during Nathan's week, and that she took him to all regularly scheduled appointments, dental appointments, vaccinations, etc. She said that she buys [B.B.]'s clothes.

¶27. Although the chancellor found that this factor favored Tiffany, Tiffany argues that the chancellor "failed to properly integrate [the primary-care-giver] consideration into [the] analysis." Tiffany also suggests that the chancellor should have given greater weight to the fact that Nathan required help from his parents. However, a review of the record shows that the chancellor was aware of these facts and gave them the weight as she saw fit. As stated, we give deference to the weight the chancellor assigned to each factor. *Id.* at 1050 (¶23).

### C. Parenting Skills[6]

¶28. The chancellor made the following findings with respect to Nathan and Tiffany's parenting skills:

Nathan says he has spanked [B.B.] when he misbehaved at school during his week when he hid [a] note from his teacher (but told Tiffany he didn't have discipline problems during his weeks.)[.] Nathan says [B.B.] responds better

---

[6] Tiffany's appellant's brief combines the continuity-of-care and parenting-skills factors. However, we address them separately.

to him tha[n] Tiffany because he's "dad" and is a bit more stern. He says he has taught [B.B.] proper safety techniques while hunting and using a BB gun and that [B.B.] has never been hurt or used it outside Nathan's presence. Nathan said [B.B.] does better in school on the weeks he is with him. Nathan admits they've had no issues, and he had no criticisms of Tiffany's parenting except for a few years ago when [B.B.] acted up at school. Nathan admitted in [his] deposition that [Tiffany] is a good mom, and in a text [he admitted] that he knows Danny loves [B.B.] and vice versa. (Ex. 31). The parties share joint legal custody (as well as joint physical), but Nathan took [B.B.] to a counselor without Tiffany's knowledge or approval and attempted to enlist the help of his teachers (two years ago) to testify against Tiffany.

Tiffany takes issue with the BB gun, machete, glue gun, etc. and says Nathan . . . uses poor judgment. She says [she] has talked to him about it. She is concerned that Nathan allows [B.B.] to play Call of Duty and said she talked to him about it [in] early 2018 and told him she didn't want [B.B.] playing it, and that it's rated 18+ and she observed [B.B.] acting out the game by shooting the babies with his Nerf gun. Exhibit 32 contains photos and text messages concerning Nathan traveling without [B.B.] properly restrained.

Nathan put forth no real issues with Tiffany's parenting skills.

This factor favors Tiffany. (Not because of the BB gun/machete - the [c]ourt is satisfied that Nathan has supervised [B.B.] with hunting gear - but because he is unwilling to compromise and discuss these issues and the [c]ourt has some concern over the video game and car seat restraints.)

¶29. Tiffany argues that the chancellor ignored evidence of Nathan's "bad judgment and poor parenting skills." Specifically, Tiffany takes issue with the fact that Nathan allowed B.B. to play "Call of Duty," carry a machete, and play with a BB gun. She also takes issue with the fact that B.B. was burned while using a hot glue gun, Nathan chased him while riding a four-wheeler, and Nathan posted pictures of B.B.'s naked backside on social media. And Tiffany alleges that Nathan raised no concerns as to her parenting skills. However, the chancellor's opinion reflects that she considered these facts and gave them the weight as she saw fit. Again, we give deference to the weight the chancellor assigned to each factor. *Id.*

11

### D. Employment Responsibilities

¶30. With respect to employment responsibilities, the chancellor made the following findings:

> Nathan works as a Regulatory Affairs Specialist at Cooperative Energy (SMEPA) - 7 a.m. - 5 p.m., Monday - Thursday and every other Friday until 3:30 p.m. His employer [is] willing to work with him on his schedule . . . . Nathan's parents live 4 hours away in Jasper, AL and help him quite a bit. [B.B.] can go to extended care at school as well. Nathan also testified that he has modified his work schedule to allow him to take [B.B.] to school every day and will place him in Extended Care at [Presbyterian Christian School] or ask his parents for assistance.

> Tiffany is a stay at home mom, works out of her home for her husband's business, social media marketing and advertising. Tiffany could not specify the exact hours that she works but the [c]ourt took note that her paychecks are still bearing her Lamar County address as opposed to her Tupelo address. She has a nanny for the babies so she can still have one on one time with [B.B.]. She said she will continue to be at home and will take him to and pick him up from school and that her husband Danny is home every night.

> This factor is neutral as the testimony shows that both parties can provide and care for the minor child with assistance (Nathan with his parents and other care givers and Tiffany with the [n]anny to relieve her from the responsibilities of the smaller children)[.]

¶31. Tiffany asserts that because she was a stay-at-home mom, this factor should have weighed heavily in her favor. The chancellor noted that Tiffany was a stay-at-home mom. However, the chancellor also noted that Tiffany did not specify her work hours. Tiffany also asserts that she hired a nanny so that she could have one-on-one time with B.B. While this may be true, the chancellor heard testimony from Tiffany's friend that she visited Tiffany five days per week, every week. As discussed, credibility determinations are for the chancellor to resolve. *Id*. at 1051 (¶27).

### E. Moral Fitness

12

¶32. Tiffany claims the chancellor abused her discretion by finding the moral-fitness factor favored Nathan. Specifically, Tiffany argues that the chancellor improperly considered her pre-divorce adultery, misapprehended evidence of church involvement, and ignored evidence of Nathan's immoral conduct.

¶33. With respect to the moral-fitness factor, the chancellor made the following findings:

> Nathan attends Venture Church, where the family attended during the marriage, and [B.B.] attends Sunday school and activities there. The [c]ourt has also reviewed Exhibit 35.
>
> Nathan would urge the [c]ourt to find that Tiffany's admitted adultery in their divorce causes this factor to weigh against her. However, "marital fault should not be used as a sanction in custody awards, nor should differences in religion, personal values and lifestyles be the sole basis for custody decisions." *Hollon v. Hollon*, 784 So. 2d 943, 947 (Miss. 2001), citing *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). Further, even within a divorce and initial custody determination, which this is not, "[w]hile acknowledging adultery as an action to consider under the moral-fitness prong, the supreme court reasoned the adultery 'may be an unwholesome influence and an impairment to the child's best interest, but on the other hand, may have no effect.' Accordingly, while adultery may be considered, the appropriate consideration is its effect on the children." *Flowers v. Flowers*, 90 So. 3d 672, 679 (Miss. Ct. App. 2012). The [c]ourt has not been presented with evidence of impairment on the child's best interest (by Tiffany's adultery during the parties' marriage) since the entry of the divorce; however the court heard testimony regarding he and [B.B.]'s continued involvement with Venture Church where the family attended prior to the divorce and their activities there, in an effort to instill a Christian belief in his son, while the court heard no testimony from Tiffany regarding [B.B.]'s involvement in church and activities which would contribute to his overall wholeness.

¶34. In *Lackey v. Fuller*, 755 So. 2d 1083, 1086 (¶13) (Miss. 2000), our supreme court held that "[a] modification of an original decree granting custody should only occur if there has been a material change in circumstances, **subsequent to the original decree**, that adversely affects the child." Although the chancellor discussed Tiffany's pre-divorce adultery when

13

considering the best interest of the child, the chancellor did not hold it against Tiffany. The chancellor explicitly stated that there was no evidence that the child's best interest had been impaired by Tiffany's adultery. Therefore, any error in considering circumstances that occurred prior to the divorce decree was harmless. *See Dearman v. Dearman*, 811 So. 2d 308, 316-17 (¶¶26-27) (Miss. Ct. App. 2001).

¶35. With respect to the parties' church involvement, the chancellor found that Nathan attended Venture Church and that B.B. went to Sunday School there. The chancellor noted that there was "no testimony from Tiffany regarding [B.B.'s] involvement in church and activities which would contribute to B.B.'s overall wholeness." Tiffany testified that she went to Orchard Church and *planned* to have B.B. involved in the church. However, as the chancellor found, there was no evidence that B.B. had been involved in church in Tupelo. Therefore, we do not find that the chancellor misapprehended evidence pertaining to church involvement.

¶36. Tiffany argues the chancellor ignored evidence of Nathan's immoral conduct. Specifically, Tiffany takes issue with various comments that Nathan made about women on social media. Although the chancellor did not mention the social media posts in her order, we cannot say that the chancellor abused her discretion, was manifestly wrong, or clearly erroneous in awarding sole physical custody to Nathan.

### F. Other Factors Relevant to the Parent-Child Relationship

¶37. Finally, Tiffany claims the chancellor abused her discretion by separating B.B. from his three half-siblings. Tiffany argues that the chancellor disregarded the half-sibling relationships and failed to cite to any unusual and compelling circumstances that would

14

justify their separation. This Court has held that "[t]he separation of siblings is not a separate *Albright* factor but one factor which the chancellor may consider along with the best interest of the child." *Moorman v. Moorman*, 28 So. 3d 670, 672 (¶7) (Miss. Ct. App. 2009) (internal quotation mark omitted).

¶38. Tiffany raised this issue in her post-trial motion. And at the hearing on the motion, the chancellor stated that she did consider the half-sibling relationships. The chancellor explained that parents divorce, remarry, and have more children, but it is her responsibility to determine the best interest of the child. The chancellor then stated that she found it was in the best interest of the child to award sole physical custody to Nathan.

## CONCLUSION

¶39. The chancellor did not apply an erroneous legal standard in awarding sole physical custody to Nathan, nor did she abuse her discretion by finding that it was in the child's best interest to award sole physical custody to Nathan. Therefore, we affirm the judgment of the chancery court.

¶40. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**