# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01253-COA

**JOHN BENJAMIN SCHMIDT**                                    **APPELLANT**

**v.**

**LESLIE RENEE SCHMIDT (GALL)**                              **APPELLEE**

DATE OF JUDGMENT:            10/21/2020
TRIAL JUDGE:                 HON. MARGARET ALFONSO
COURT FROM WHICH APPEALED:   HARRISON COUNTY CHANCERY COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      GRADY MORGAN HOLDER
ATTORNEY FOR APPELLEE:       MICHAEL B. HOLLEMAN
NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:                 AFFIRMED - 05/10/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., GREENLEE AND McDONALD, JJ.

### McDONALD, J., FOR THE COURT:

¶1. John Schmidt and Leslie Schmidt-Gall were divorced in 2015 and shared joint physical and legal custody of their two minor children. On August 21, 2018, John filed a petition for modification of child custody, requesting sole physical custody of both children. Leslie counterclaimed, arguing that she should be given sole physical custody. On October 21, 2020, the chancery court granted Leslie sole physical custody of the children. On November 12, 2020, John appealed, arguing the following issues: (1) whether the chancery court erred in finding that there was a material change in circumstances entitling Leslie to sole physical custody; and (2) whether the chancery court erred in its application of the *Albright* factors. After a thorough review of the briefs of the parties and the record, we

affirm the chancellor's judgment of modification of custody.

## Statement of the Facts and Procedural History

¶2. John and Leslie were married on August 13, 2007, in Gulfport, Mississippi. During the marriage, John and Leslie had two children, a girl, A.S., born in 2008, and a boy, C.S., born in 2013.[1] Both Leslie and John were employed with the Navy. Leslie was a logistics analyst, and John was a military contractor. The couple separated on or about November 15, 2014, and did not cohabit thereafter. John filed a complaint for divorce and for temporary relief in the Harrison County Chancery Court on January 27, 2015, on the grounds of habitual cruel and inhuman treatment, or alternatively, adultery and irreconcilable differences. John requested custody and control of the minor children and that Leslie be required to pay a reasonable sum each month in child support. Leslie answered and counterclaimed for divorce and custody as well.

¶3. The parties later withdrew their fault grounds, and the chancery court entered a final divorce judgment on the grounds of irreconcilable differences on July 14, 2015. The judgment incorporated a property settlement and child custody agreement that the parties had executed. The judgment provided that Leslie and John share joint physical and legal custody of their minor children until August 1, 2018, or until either party moved 100 miles from Gulfport, Mississippi. The agreement specifically stated:

CUSTODY: By agreement of the parties, the parties shall be and hereby are

---

[1] We use initials to protect the minors' identities.

awarded joint legal custody of their minor children and they shall be awarded joint physical custody. Joint legal custody means that the parents or parties share the decision-making rights, the responsibilities and the [sic] authority relating to the health, education and welfare of the minor children. An award of joint legal custody obligates the parties to exchange information concerning the health, education, and welfare of the minor children, and to confer with one another in the exercise of decision-making rights, responsibilities and authority.

Handwritten after the last sentence of this paragraph was the following:

The joint physical award shall continue until the first of these events occur: August 1, 2018 or either party moves more than one hundred (100) miles from Gulfport, MS. Upon the first occurring event, either party may return to court to adjudicate as same shall constitute a substantial and material change in circumstances adverse to the children so as to warrant a modification upon proper complaint and service of process.

¶4. Pursuant to the judgment, A.S. and C.S. lived two weeks during each month with John and two weeks with Leslie. After the divorce, Leslie continued to live in Gulfport, Mississippi, and A.S. attended school in Harrison County. Leslie later moved to Long Beach, Mississippi, and purchased a house there in 2016. Leslie enrolled the children in Long Beach public schools because she believed Long Beach had a better school system. In March 2018, Leslie married Seth Gall. Seth was also in the Navy and had three children, ages nineteen, fifteen and twelve. Seth's fifteen-year-old lived with Leslie and Seth, and the other two children lived in California with their mother.

¶5. After the divorce, in September 2015, John took a civilian job in New Orleans, which was about an hour and a half from his home in Gulfport. This job location required John to leave home around 4 a.m. each morning. During his two-week custody periods, a daycare

3

worker would pick up the children from John before 4 a.m. and keep them with her until the daycare opened for the younger child, C.S. She then took the older child, A.S., to school. She also kept the children after daycare and after school until John returned in the evening. When the daycare worker was no longer able to do this, a neighbor began getting the children on John's workdays. This arrangement with the neighbor lasted for two weeks.

¶6.    When Leslie found out about the arrangement, she was concerned about the children's safety. So beginning in December 2015 until sometime in February 2018, Leslie picked up the children during John's custodial period just as the daycare worker and neighbor had previously done. She would then meet John on or near Interstate I-10 to exchange the children in the afternoon.

¶7.    In 2018, John purchased a home in Long Beach in the same neighborhood as Leslie's house. John married Clarke Zoe Schmidt in June 2018, and they had one child together. Clarke had two children from a prior marriage. In the fall of 2018, John was deployed to Dubai after being stationed in Virginia for pre-deployment training. His deployment was scheduled to last from October 19, 2018, until May 2019.

¶8.    Prior to his deployment, on August 21, 2018, John filed a petition for citation for contempt[2] against Leslie and a motion to modify the divorce judgment in the Harrison County Chancery Court. In his petition for modification, John stated that there had been a

---

[2] In his petition for contempt, John pleaded that Leslie had refused to discuss the children's wellbeing with him and that she had smoked cigarettes in the presence of the minor children.

4

material change and substantial change in circumstances since the initial judgment was entered. Although John was being deployed, he requested that the child custody agreement be modified to grant him "paramount care, custody and control of the minor children."[3] Further, John requested that Leslie be required to pay child support, that her visitation with the children be supervised, and that the telephone visitation schedule be modified. Finally, John pleaded that if the court did not grant him physical and legal custody of the children due to his deployment, then the court should allow the children to stay with his current wife, Clarke, while he was deployed.

¶9. After hearing John's petition and motion on October 9, 2018, the chancery court issued a temporary order on November 9, 2018, which ordered (1) that Leslie be given temporary physical custody until trial because John had been deployed for training in Virginia and was anticipated to be in Dubai from October 19, 2018, through the end of May 2019; (2) that Clarke has visitation on certain weekends from Friday at 6 p.m. to Sunday at 6 p.m.; (3) that John pay child support of $993 monthly, effective on October 1, 2018, and on the first day of each month thereafter; (4) that John have the right to one telephone or video call with each child per day, not to exceed fifteen minutes each; and (5) that if there was a dispute between the primary care physician and urgent care physician concerning care needed for the children, then the primary care physician would have the final say.

---

[3] Additionally, John requested the judgment be modified so that he no longer had to pay one-half of the children's after-school care or medical care and that he be able to claim the children as exemptions for tax purposes.

¶10.   On June 28, 2019, after he returned from his deployment, John filed a motion for modification of the temporary order and other relief.[4]  On July 23, 2019, Leslie answered John's motion for modification and contempt and filed a counter-complaint for modification and contempt.  Leslie admitted there had been a substantial and material change in circumstances that warranted modification of custody but claimed that she should be awarded physical custody of the minor children.  Leslie denied all allegations of John's petitions for contempt and modification.  She also denied that he was entitled to any relief.

¶11.   Leslie stated that it would be in the best interest of the minor children that physical custody be awarded to her, that John be awarded reasonable visitation rights, and that the court should award her reasonable child support.  She pleaded that John should provide for the health, dental, ocular care, and college education for the minor children and that he be required to carry life insurance for the benefit for the children.  Leslie also argued that the court should find John in contempt for unilaterally terminating his support payments[5] and award her reasonable attorney's fees and costs.

¶12.   The chancery court entered an amended temporary order on August 30, 2019, finding

---

[4] In his motion, John requested that the court modify the temporary order and award him with the following: (1) temporary legal and physical care, custody, and control of the minor children; (2) a reasonable sum of money each month in temporary child support; (3) a ruling that Leslie be temporarily responsible for maintaining the health, dental, and ocular insurance of the minor children; and (4) an injunction preventing Leslie from bothering, harassing, or interfering with his peaceful enjoyment of life.  The basis of the modification request was that he had returned from deployment.

[5] Leslie argued that John had not paid child support for June and July 2019.

that Leslie should continue to have physical custody until trial and that John have the specified visitation schedule. The court ordered John to continue to pay child support on the first day of each month but reduced the amount to $706 monthly, effective August 1, 2019. Additionally, during the periods where one parent had custody or visitation, the other parent had the right to unmonitored telephone or video calls nightly before 7 p.m. for fifteen minutes. The Court also ordered that John would be responsible for transportation of the children to and from visitation.

¶13.   On January 7, 2020, Leslie filed an answer to John's original contempt and modification petition, generally denying John's allegations in them.

¶14.   Prior to trial, Seth was deposed because he was scheduled to be deployed to Guam at the time of the trial. According to Seth,  John berated Leslie by calling her a horrible mother and calling her horrible names such as b****,  c***, and "psycho." Seth also testified that "things had to go John's way or the highway." Further, Seth said that he confronted John about his behavior in 2018, asking, "How would you feel if I called his wife a c***?" But John did not respond. Instead, Seth testified that John continued to berate Leslie through phone calls and text messages to the point where Leslie had to block him.

¶15.   The trial took place on March 16, 2020, and July 13-16, 2020. John called Leslie as an adverse witness and questioned her about smoking and vaping around the children. According to Leslie, she and Seth stopped smoking on October 8, 2018, but she occasionally vaped. However, she stated that they never smoked around children. Leslie admitted that

7

she called Clarke a f****** b****, but she had done so because her and John's relationship had deteriorated. Leslie said that John told her that she answers to Satan and that dealing with her was like dealing with a fatherless sixteen-year-old. Leslie also testified that John, without her knowledge and consent, executed a power of attorney to give his custodial rights to Clarke while he was deployed.

¶16. Clarke worked twelve-hour shifts as a nurse in Hammond, Louisiana. She testified that John was a loving father and protector and that he should receive custody of the children. She also stated that during John's custody periods she helped the children with their homework. She testified that on one occasion she had to treat Leslie's children for lice. Additionally, Clarke stated that she and John invited Leslie and Seth over for birthdays and special events. However, Leslie and Seth stopped coming. Clarke also testified that during one of C.S.'s baseball games, Leslie started yelling at her, but she did not recall why. Further, Clarke testified that when A.S. and C.S. would come over, they would often share a bed with her children. When Clarke's children's father would come to visit, all the children would sleep with him as well.

¶17. John testified he should receive custody of the children because he was passionate about being a father, and the children would be taken care of when they were in his care. According to John, the children would consistently have small medical issues such as lice and warts while in Leslie's care, but he failed to provide medical records to substantiate his complaints and allegations. John also filed a complaint with Child Protective Services (CPS)

8

alleging emotional medical neglect, physical neglect, and emotional abuse/neglect.[6]
However, CPS found no merit to the allegations raised in his complaint. Thus, he believed
that he could take better care of the children because Leslie allegedly could not even maintain
their hygiene properly. John also stated that the children's grades had started to fall while
they were in Leslie's custody. He stated that he did not understand why their grades were
not a big deal to Leslie. John testified that he would discipline the children with a verbal
reprimand followed by taking away toys, snacks, or dessert or having the children do extra
educational tasks. John said that in some instances he disciplined the children through the
use of corporal punishment along with talking to the children about their behavior. He
further stated that Clarke has been a great step-parent to the children. Because she was a
nurse, she would often treat the children for things that occurred while they were in Leslie's
care. John admitted that when he had the job in Louisiana, the children were not on a regular
routine and would often have to wake up as early as 3:00 a.m. because he had to be at work
at 5:00 a.m.

¶18.    During cross-examination, John testified that he began dating Clarke in April 2017,
and during his two-week custody periods, he and Clarke slept in the same bed. He further
stated the following about the children:

> They sleep wherever they want to sleep. Sometimes it's up on those two pull-

---

[6] Specifics of the allegations are contained in a confidential youth court report. The youth court ultimately entered a "Take No Action" order after a thorough review of the CPS investigation.

out beds; sometimes they want to sleep on the floor in our room, and they will make big cot; sometimes they want to sleep in the bunk beds; and sometimes they want to sleep on the couch downstairs or on the floor. They sleep wherever they want to sleep.

John testified that A.S.'s grades had dropped following the divorce, which he felt was due to Leslie. He said that Leslie did not care if A.S. received an F on a school test and introduced an excerpt of an audio recording between him and Leslie:

John:        When are you ever gonna come to me about her grades in, in concern about it?

Leslie:      When it's an actual concern.

John:        Oh, an F is not an actual concern, is it?

Leslie:      No.

John:        No. Yeah. There you go.

John further admitted that in addition to the recordings he made of Leslie, he also recorded A.S. and C.S. when they were at his house. According to John, Leslie had blocked him from talking to his children.

¶19.   Leslie testified that the children had a routine when they were in her custody. When the children got home from aftercare, Leslie testified that they would do their homework and study. Supper would be ready around 5:30 p.m. She and Seth would prepare meals for the children, including but not limited to steak, chicken, fish, salmon, asparagus, and peas. According to Leslie, the children like vegetables and have three meals a day, including school lunches. After supper, Leslie would allow the children to play and talk to John before

10

7 p.m. Leslie testified that the children would bathe, get dressed, and be in their rooms with the lights off at 8:30 p.m. Discipline would include a time out or a "good talking to." According to Leslie, she and Seth planned to build a home in Stone County and to move in three to five years. Leslie testified that she intends to continue to work for the Navy until retirement. Under Leslie's custody, the children were involved in extracurricular activities, with A.S. playing softball and C.S. playing baseball. She and Seth attended the games, but John came to just a few games. Furthermore, Leslie testified that John's recording of the children distressed A.S. Leslie stated that A.S. would become very nervous when it was time for her to go to her father's home.

¶20. Following the trial, on July 22, 2020, John filed a motion to dismiss Leslie's counterclaim, arguing that Leslie failed to allege in her pleading an adverse effect or impact on the minor children to justify a modification of child custody. Leslie claimed that the youngest child's reaching school age was a material change. According to John, age alone did not constitute a material change in circumstances. Thus, Leslie's counterclaim should be dismissed with prejudice. Leslie responded to John's request to dismiss her counterclaim on August 7, 2020, arguing that she had sufficiently alleged a material change in circumstances. John responded on September 22, 2020, stating that Leslie did not put on proof at trial of a material change in circumstances adverse to the children.

¶21. On August 7, 2020, Leslie filed a motion to amend her counterclaim pursuant to Rule 15 of the Mississippi Rules of Civil Procedure to conform to evidence. On September 22,

11

2020, John responded that the court should deny Leslie's motion because she failed to allege a material change adverse to the minor children, and failed to put on proof at trial of a material change in circumstances. Leslie also filed a motion to supplement the record, requesting that the Court admit a recording and a full transcript of an audio recording of a telephone conversation between her and John about A.S.'s grades.

¶22. On October 21, 2020, the chancery court issued several judgments and orders in the matter, including (1) an order regarding the motion to supplement the record; (2) an order on the contempt petitions; (3) an order denying John's motion to dismiss and granting Leslie's motion to amend; and (4) a judgment of modification of custody.

¶23. The chancery court granted Leslie's motion to supplement the record in part, admitting into evidence the full recorded telephone conversation between the parties concerning A.S.'s grades. But the court would not allow the transcript of the recorded conversation to be entered. The recording included the following exchange:

| Leslie: | So what do you want me to do? What do you want me to do? |
| John: | Maybe to [f***ing] care. I mean, just come at me with that, please. I got to go. |
| Leslie: | I do care. |

¶24. The chancery court denied both Leslie's and John's motions for contempt. The court noted that both Leslie and Seth stated that they quit smoking cigarettes in October 2018, and prior to that, they did not smoke in the home. The chancery court found that Leslie was not in contempt on that issue. Additionally, the court found that the "Property Settlement and

Child Custody Agreement" only stated that the parties must be "sensitive to the danger of exposing [the children] to any harmful condition, such as cigarette smoke." The chancery court also found that Leslie had not refused to share information with John about the children's wellbeing. In addition, the court found that John was not in contempt regarding his child support obligation. The court stated that John could have reasonably believed that his child support obligation would end and that the parties would return to the prior custody arrangement when his deployment ended based upon Mississippi Code Annotated section 93-5-34 (Rev. 2018).[7] Therefore, the chancery court did not find John in contempt.

¶25. The chancery court denied John's motion to dismiss Leslie's counterclaim and granted Leslie's motion to amend. The court stated that John had not filed a responsive pleading asserting a Rule 12(b)(6) defense, *see* M.R.C.P. 12(b)(6), that trial on the merits commenced without John seeking a dismissal for failure to state a claim, and that John only asserted that Leslie's counter-claim was insufficient after the conclusion of the trial. Because John's

---

[7] Mississippi Code Annotated section 93-5-34(3)(a)-(b) states, "When a parent who has custody, or has joint custody with primary physical custody, receives temporary duty, deployment or mobilization orders from the military that involve moving a substantial distance from the parent's residence having a material effect on the parent's ability to exercise custody responsibilities: (a) Any temporary custody order for the child during the parent's absence shall end no later than ten (10) days after the parent returns, but shall not impair the discretion of the court to conduct a hearing for emergency custody upon return of the parent and within ten (10) days of the filing of a verified motion for emergency custody alleging an immediate danger of irreparable harm to the child; and (b) The temporary duty, mobilization or deployment of the service member and the temporary disruption to the child's schedule shall not be factors in a determination of change of circumstances if a motion is filed to transfer custody from the service member."

active participation in the litigation operated as a waiver of the defense of failure to state a claim upon which relief may be granted as a matter of law, the court denied John's motion to dismiss. The court also granted Leslie's motion to amend, finding that by failing to raise the defense of insufficiency of the pleadings prior to the trial and by failing to object to testimony and evidence on grounds that it was outside of the pleadings, the parties impliedly consented to trial on the issues of modification of joint physical custody due to a material change in circumstances adversely affecting the children despite the failures of both parties' pleadings. Therefore, the court found that amending the pleadings to conform to the evidence was not prejudicial to either party and thus was appropriate.

¶26. In its judgment of modification of custody, the court found that the language of the Property Settlement and Child Custody Agreement, which set forth automatic conditions to be considered a material change in circumstances, was void, unenforceable, and against public policy. However, the court did find that a material change of circumstances had occurred since the court's 2015 award of joint custody because of the parties inability to co-parent. The court identified several examples of this, including, but not limited to

> (1) testimony regarding the parties inability to discuss the children attending counseling; (2) testimony that Leslie and John would engage in verbal altercations in the presence of the children; (3) testimony that Leslie and Clarke engaged in a verbal altercation in the presence of the children at A.S.'s softball game after having an argumentative telephone call with John Schmidt minutes earlier; (4) testimony that John sought medical treatment for C.S. without consulting Leslie and from a medical care clinic, instead of his primary care provider; (5) testimony that John and Clarke chose C.S.'s teachers without contacting Leslie or discussing it with her; (6) testimony that John and Clarke have discussed this court matter with the children on more

14

than one occasion.

The court further found that these changes had adversely affected the children, and in the best interests of the children, a modification was required. The court stated that the anger and communication problems between the parents had so negatively impacted the children that they were placed in counseling.

¶27. Because the chancery court found that there had been a material change in circumstances that adversely affected the children, the court performed an *Albright* analysis.[8] In its review, the court made findings on each factor that will be discussed below. After a thorough *Albright* analysis, the court found that modification of physical custody was in the best interest of the children, and thus the court terminated the arrangement of joint physical custody. The court awarded Leslie sole physical custody of the minor children.

¶28. The court stated that both parties were to continue to have joint legal custody and share in decision making rights, responsibilities, and authority relating to the health, education, and welfare of A.S. and C.S. The court ordered the parties to exchange all information concerning the health, education, and welfare of A.S. and C.S. and to confer with each other when making decisions concerning the health, education, and welfare of A.S. and C.S. Neither parent nor step-parent was to make any unilateral decisions concerning the children unless emergency circumstances necessitated such action. The court also ordered the specific visitation for John, and he was ordered to continue to pay monthly child support

---

[8] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

15

of $706.

¶29. On November 12, 2020, John appealed, arguing the following issues: (1) whether the chancery court erred in finding that a material change in circumstances had occurred since the final judgment of divorce solely due to the parties' inability to co-parent; and (2) whether the chancery court erred in its application of the *Albright* factors. Finding no error, we affirm.

**Standard of Review**

¶30. "This Court employs a limited standard of review on appeals from chancery court." *Campbell v. Watts*, 192 So. 3d 317, 318 (¶5) (Miss. Ct. App. 2015) (quoting *Corp. Mgmt. Inc. v. Greene County*, 23 So. 3d 454, 459 (¶11) (Miss. 2009)). "Under that standard, this Court will not disturb the factual findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Id*. Questions of law are reviewed de novo. *Id*.

**Discussion**

I.  **Whether the chancery court erred in finding that a material change in circumstances had occurred since the final judgment of divorce solely due to the parties' inability to co-parent.**

¶31. In this case, the chancery court found that there was a material change in circumstances that adversely affected the children because the parents were no longer able

16

to communicate and co-parent, making joint physical custody unmanageable. But John contends that this finding alone is insufficient to form a basis for modification.

¶32. "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Riley v. Heisinger*, 302 So. 3d 1243, 1255 (¶45) (Miss. Ct. App. 2020) (quoting *Albright*, 437 So. 2d at 1005). "A modification of custody is warranted when the moving parent successfully shows "(1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." *Munday v. McLendon*, 287 So. 3d 303, 310 (¶27) (Miss. Ct. App. 2019) (quoting *Powell v. Powell*, 976 So. 2d 358, 361 (¶11) (Miss. Ct. App. 2008)).

¶33. "In analyzing whether a material change of circumstances has occurred, "[t]he chancellor must consider the 'totality of the circumstances.'" *Domke v. Domke*, 305 So. 3d 1233, 1240 (¶17) (Miss. Ct. App. 2020) (quoting *Heisinger v. Riley*, 243 So. 3d 248, 256 (¶29) (Miss. Ct. App. 2018)). "Events which would not, alone, be a sufficient material change may in combination provide a basis for modifying custody." Deborah H. Bell, *Bell on Mississippi Family Law* § 12.12[a], at 453 (3d ed. 2020). "The chancellor, as the trier of fact, possesses the ultimate discretion to weigh the evidence the way he sees fit." *Warner v. Thomas*, 281 So. 3d 216, 223 (¶21) (Miss. Ct. App. 2019). "It is well established that chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations

17

matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence." *Weathers v. Guin*, 151 So. 3d 272, 276 (¶16) (Miss. Ct. App. 2014).

¶34. Mississippi Code Annotated section 93-5-24(6) (Rev. 2018) provides that "[a]ny order for joint custody may be modified or terminated upon the petition of both parents or upon the petition of one (1) parent showing that a material change in circumstances has occurred." However, in analyzing this provision, our supreme court has held that "[i]n order to modify child custody, it must be proven that a material change in circumstances has occurred that adversely affects the welfare of the child." *Porter v. Porter*, 23 So. 3d 438, 447 (¶23) (Miss. 2009).

¶35. Joint custody fits parents who are willing to make joint custody feasible. *Waller v. Waller*, 754 So. 2d 1181, 1184 (¶13) (Miss. 2000). "According to Vitauts M. Gulbis, Annot., Propriety of Awarding Joint Custody of Children, 17 A.L.R. 4th 1013, 1016 (1982)[,] it has been held that the cardinal criterion for an award of joint custody is the agreement of the parties and their mutual ability to cooperate in reaching shared decisions in matters affecting the child's welfare.'" *Id*. at n.1. This Court previously upheld a chancellor's finding that there was a material change in circumstances detrimental to the children's best interest when the parents had communication problems regarding the education and health of the children and could not agree on even minuscule matters, such as the length of a child's hair. *Tidmore*

*v. Tidmore*, 114 So. 3d 753, 760 (¶18) (Miss. Ct. App. 2013).

¶36. Even John and Leslie admitted that their co-parenting relationship had significantly deteriorated having adverse effects on the children:

> Court:    And would you agree with me that your co-parenting in problems with co-parenting had a negative impact on the children?
>
> John:    Definitely, yes.
>
> . . . .
>
> Court:    We've heard testimony from the father about the difficulty you and he had coparenting. Would you agree with his assessment that y'all had problems?
>
> Leslie:    Yes.

¶37. The chancery court found that neither party appropriately set forth the custody modification requirements in the respective pleadings; however, by a separate order, the court found that amendment of the pleadings to conform to the evidence was appropriate to remedy the error. In doing so, the testimony and evidence before the court showed that the relationship between the parties had deteriorated during the course of litigation.

¶38. Like *Tidmore*, John and Leslie could no longer communicate effectively and disagreed on numerous matters. The inability of the parties to co-parent and the adverse effect on the children was apparent to the chancery court who itemized numerous instances of disagreement between the parties, which is supported by the record. The court found that the material change in circumstances had adversely impacted the emotional well-being of the

children. A.S. became nervous when her parents were together due to the strained relationship between the parties. She also became nervous when it was time to go to John's home for visitation because John insisted on recording the children whenever they spoke about their mother or the litigation. C.S. was very upset and emotional about the situation between the parties, and the court noted that the children seemed more tired when the parties had joint physical custody. The chancery court stated that the anger and communication problems between the parents negatively impacted the children such that the children were placed in counseling. Therefore, the record clearly supports the chancery court's finding that John and Leslie's inability to co-parent was substantial enough to constitute a material change in circumstances that adversely affected the children.

**II. Whether the chancery court erred in its application of the *Albright* factors.**

¶39. John challenged the chancery court's *Albright* analysis and findings that favored Leslie. However, our review of the record reveals that each of the chancery court's findings was sufficiently supported by the record and was not manifestly wrong or in error.

¶40. "Where a party proves that an adverse substantial or material change has occurred, the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Domke*, 305 So. 3d at 1240 (¶17) (quoting *Heisinger*, 243 So. 3d at 256 (¶29)). "The chancellor must address each *Albright* factor that is applicable to the case." *Harden v. Scarborough*, 240 So. 3d 1246, 1251 (¶11) (Miss. Ct.

20

App. 2018); *see Powell v. Ayars*, 792 So. 2d 240, 244 (¶10) (Miss. 2001). "However, the chancellor need not decide that each factor favors one parent or the other." *Vassar v. Vassar*, 228 So. 3d 367, 375 (¶26) (Miss. Ct. App. 2017). In other words, the chancellor may find that a factor is neutral.

¶41. In analyzing the *Albright* factors, the chancery court is in the best position "to listen to the witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Mitchell v. Mitchell*, 180 So. 3d 810, 816 (¶14) (Miss. Ct. App. 2015) (quoting *Carter v. Carter*, 735 So. 2d 1109, 1114 (¶19) (Miss. Ct. App. 1999)). "When reviewing the chancery court's application of the *Albright* factors, the appellate court reviews the evidence and testimony presented at trial under each factor to ensure the chancery court's ruling was supported by record." *Id*. at 816 (¶10). Accordingly, we review the chancery court's findings in turn.

### A. Age, Health, and Sex of the Child

¶42. The chancery court found as follows:

> A.S. is a 12 year old girl who suffers no physical health problems. C.S. is a 7 year old boy who suffers no physical health problems. Both children have been involved in counseling during the course of this litigation, but the Court was not made aware of any diagnosis associated with the counseling. This factor is neutral.

John argues that the court erred in not finding that this factor weighed in his favor because he was more qualified to meet the children's medical needs and health. But even CPS found that John's medical concerns were not substantiated, and based on this finding the youth

21

court entered a "Take No Action" order. In the judgment of modification of custody, the chancery court found that both parents' inability to cooperate with one another led to the children being placed into counseling. Therefore this factor was neutral, and that determination is supported by the record.

### B. Continuity of Care

¶43. The chancery court found that the continuity-of-care factor weighed in Leslie's favor. The court said that in addition to having cared for the children during her custody periods, Leslie had two and a half years continuity of care during John's custody periods. The chancery court found that from September 17, 2015, to some time prior to his deployment in July 2018, John commuted to work in Belle Chasse, Louisiana, on weekdays. During his two-week periods of physical custody between September 17, 2015, and December 2015, John left the children in the care of a neighbor or sitter and would drop the children off with that person before 4:00 a.m.

¶44. Testimony presented at trial further showed that from December 2015 to February 2018, the parties agreed that Leslie would care for the children instead of John's relying on a neighbor. This meant that Leslie would meet John no later than 4:15 a.m. on the weekdays to get the children, who would go back to sleep prior to their morning routine and school. Leslie also would pick the children up from after school or daycare, and drop them off near an I-10 exit no later than 6:00 p.m. so John could have them in the evenings. Therefore, the record shows that Leslie was still primarily taking care of the children even when John had

custody and continued to do so when she temporarily received physical custody. Although this arrangement ended in February 2015, it is still relevant to the overall care of the children since the divorce.

¶45. Additionally, the court found that Leslie had dealt with most of the children's teachers, day cares, and doctors. Although the record showed that John communicated with the children's teachers when he was not deployed, Leslie did as well and attended all teacher-parent conferences. The court also acknowledged that although John had helped the children with schoolwork when he had them, he was often unable to do so because of the nature of his job. Furthermore, the record reflects that the children were not on a routine schedule when they were in John's custody. Beginning in July 2018, when John was deployed, Leslie cared for the children exclusively under the temporary order.

¶46. This Court has found that a parent who, among other things, routinely takes the child to the doctor should be favored. *Klink v. Brewster*, 986 So. 2d 1060, 1064 (¶14) (Miss. Ct. App. 2008). Additionally, a parent who was more involved in school activities should also be favored. *Tritle v. Tritle*, 956 So. 2d 369, 375 (¶18) (Miss. Ct. App. 2007). The chancery court's ruling is supported by the law, and thus we find no error in the chancery court's finding that this factor weighed in Leslie's favor.

### C. Parties' Parenting Skills

¶47. The chancery court performed a thorough analysis of this factor, and after review of the record, we agree with the chancery court that this factor favors Leslie. The record shows

23

that both parents have their own parenting skills and beliefs. The testimony before the court revealed that Leslie disciplined the children by sending them to their rooms for a time out. John disciplined the children with a verbal reprimand and his next step is to take away toys, snacks, or desert, or to have the children do extra educational tasks. John also testified that in some instances he used corporal punishment along with talking to the children about their behavior.

¶48. The chancery court specifically addressed all issues raised by John regarding Leslie's inattentiveness to the children's medical needs. John argues that the children had multiple medical and hygiene issues, but the record simply does not support these allegations. He raised many medical issues regarding the children such as warts, ingrown toenail, et cetera, but he failed to substantiate his allegations with medical records. Leslie, however, provided sufficient proof refuting John's allegations, including medical records to show that the children received adequate medical care. Additionally, John argues that A.S.'s grades slipped as a result of being in Leslie's custody. Again, the record reflects the contrary; in fact, A.S.'s grades improved. Moreover, the record supports the questionable nature of John's parenting skills, such as John's statements that he does not believe it was necessary for the children to wear seatbelts when traveling in the parties' neighborhood at a slow rate of speed. John also allowed Clarke to dye A.S.'s hair purple without consulting Leslie, and he recorded the children when they talked about Leslie. The court also raised concern about the discussions John and Clarke had with the children about the litigation. The court found

24

that it was improper to place the children in the middle of the disputes between the parents and that doing so encourages the impression that the children are required to choose between their parents. Furthermore, during John's periods of physical custody, the children were getting less than eight hours of sleep at night. Thus, the record supports the chancery court in finding this factor weighs in Leslie's favor.

### D. Parties' Willingness and Capacity to Provide Primary Child Care

¶49. The chancery court found that this factor did not weigh in either party's favor. After review of the record, we agree.

¶50. According to the record, Leslie worked Monday through Friday from 7 a.m. to 3:30 p.m. or 4:00 p.m. As a result of the COVID-19 pandemic, however, Leslie worked from home and supervised the children's remote learning. Leslie testified that she was eligible for deployment three years in the future from the time of the trial, but she could not state with certainty that she will or will not be deployed in the future. Seth, however, was deployed to Guam at the time of trial. John testified that he worked Monday through Friday from 6:30 a.m. to 4:00 p.m. and was off every other Monday. John testified that he is no longer eligible for future deployment, will retire from the United States Navy in three years, and after retiring, he will serve five years in the naval reserves. Further, Clarke, is a nurse working twelve-hour shifts, three days a week, on a rotating schedule at a hospital in New Orleans, Louisiana. Because all parties are working adults, we find that the chancery court properly found that this factor favors neither parent.

25

### E. Parties' Physical and Mental Health and Age

¶51. The court found that both parents are in good physical and mental health and thus the factor is neutral. We agree. The record shows that Leslie and John are 35 and 43, respectively, and in good health. Therefore, there is no error. *See Hollon v. Hollon*, 784 So. 2d 943 (¶21) (Miss. 2001) (finding this factor balanced equally between parties who were ages thirty-six and thirty-eight).

### F. Emotional Ties of Parent and Child

¶52. The chancery court found that the children have emotional ties to both parents, and thus the factor is neutral. In *Hollon*, our supreme court held that when there was no testimony presented to show that the children had a stronger attachment to one parent over the other, then that factor is neutral. *Id*. at (¶22). In this case, neither party testified that the children exhibited a stronger attachment to one or the other. Leslie mentioned that A.S. would be nervous to go to John's house from fear of being recorded. However, this does not necessarily mean that A.S. has a stronger emotional tie with Leslie. Therefore, we find that the chancery court did not err in finding this factor was neutral.

### G. Parties' Moral Fitness

¶53. John argued that Leslie is morally unfit because she smoked cigarettes and vaped. The record supports the chancery court's finding that Leslie and Seth smoked cigarettes until October 2018, and currently vaped, but they did not smoke or vape in the home or with the children in the car. This Court has held that a parent's smoking outside the presence of

children does not weigh against that parent. *Owens v. Owens*, 950 So. 2d 202, 208 (¶18) (Miss. Ct. App. 2006). In addition the court found that John and Clarke cohabitated and had a child prior to their marriage, but did not hold this against John. Instead, the court found the moral factor to be neutral, neither weighing in favor or against either party.

### H. Home, School, and Community Records of the Children

¶54. The chancery court found that this factor weighs in Leslie's favor. We agree. In reviewing the record, A.S.'s school records show that her overall grades improved in the 2018-2019 fifth-grade school year and during the first semester of the 2019-2020 sixth-grade school year. The only time that A.S. truly struggled was in a reading class when she was in third grade. Additionally, A.S. received excellent comments from her teachers such as "excellent behavior," "works well with other students," and "displays a positive attitude in class." Moreover, the record reflects that the children were engaged in extra curricular activities while in Leslie's custody. Accordingly, the chancellor did not err in weighing this factor in Leslie's favor.

### I. Each Child's Preference if the Child is at least Twelve Years Old

¶55. The chancery court found that although A.S. was twelve years old, no testimony or evidence was submitted by either party regarding her preference and therefore the chancery court found that this factor was not applicable to its analysis.

### J. Stability of the Home Environment

¶56. The chancery court found that both parents had stable employment that allows each

27

to be available for the children, but the factor slightly weighed in Leslie's favor.

¶57. Leslie testified that the children have a routine, which included picking them up from school, helping them with homework, cooking and serving dinner, playing, bathing, and going to bed no later than 8:00 p.m. in their own beds. John testified that at his home, A.S. had her own room, and C.S. shares a room with one of Clarke's children, by their choice. However, John further testified that the children were allowed to sleep wherever they desired, but on school nights, they slept in assigned beds. On one occasion, all the children, including A.S., a minor female, were allowed to sleep in the same room with Clarke's former husband, Zack, when he came to visit his and Clarke's children. Because the record reflects that Leslie has a regular, more structured routine with the children, the chancery court did not err in slightly favoring Leslie in weighing this factor.

### K. Stability of Employment

¶58. The chancery court found that this factor was neutral because both parties had stable employment. Leslie was employed as an E6 logistics specialist with the Navy and has been employed with the Navy for fifteen years. John was employed as a supply technician with the Navy and will retire in three years. He was not eligible for future deployment. Since both parties were similarly situated, the chancery court did not err in weighing this factor as neutral.

¶59. After a thorough review of the record, we find that the chancery court did not err in its analysis of the *Albright* factors or its determination that modification was in the best

28

interests of the children. Further, the chancery court did not err in awarding Leslie sole physical custody of the children.

## Conclusion

¶60. We find that the chancery court did not err in finding that a material change in the circumstances, adversely affecting the children, warranted a modification of the prior judgment of divorce concerning custody. Moreover, we find that the chancery court properly performed an *Albright* analysis in determining what was in the best interest of the children. Accordingly, we affirm the judgment of the chancery court.

¶61. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**