# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00771-COA

**WALTER DAY**                                                                 **APPELLANT**

**v.**

**HEAVEN L. DAY**                                                               **APPELLEE**

DATE OF JUDGMENT:            07/08/2024
TRIAL JUDGE:                 HON. BRADLEY D. TENNISON
COURT FROM WHICH APPEALED:   LEE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      ROBERT W. DAVIS JR.
ATTORNEYS FOR APPELLEE:      JASON D. HERRING
                             MICHAEL SPENCER CHAPMAN
NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:                 AFFIRMED - 11/25/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Heaven Day and Walter Day married in 2012. The couple shared two children: one was the natural child of Heaven and adopted by Walter, and the other child was born naturally to both Heaven and Walter. In 2020, Heaven and Walter filed a joint complaint for an irreconcilable-differences divorce and included an agreed-upon joint custody agreement. Three years later, Heaven filed a petition for custody modification, asserting that a material change in circumstances adverse to the children had occurred. Following a hearing, the chancellor modified the custody order to grant Heaven custody of both children, with visitation rights for Walter. Aggrieved, Walter appealed. This Court affirms.

## FACTUAL AND PROCEDURAL HISTORY

¶2.     Heaven and Walter were married in Lee County on June 9, 2012.  The couple shares two children, LD and WD.[1]  LD was born to Heaven on September 11, 2007, and legally adopted by Walter on January 26, 2017.[2]  WD was born to both Heaven and Walter on April 13, 2018.  Heaven and Walter separated in February 2020.

¶3.     On March 24, 2020, Heaven and Walter filed a joint complaint for an irreconcilable-differences divorce in the Lee County Chancery Court.  On May 5, 2020, the court entered a qualified domestic-relations order concerning Walter's retirement account.  On May 18, 2020, Heaven and Walter filed a child custody, support, and property settlement agreement. The agreement stated that the parties would "share joint legal and physical custody of the parties' minor children," splitting the time 50/50, and the agreement contained a visitation schedule for both parties.  The agreement also included a statement that Walter and Heaven:

> agree[d] to wait a minimum of six (6) months, a period which shall begin after the party notifies the other of the potential long-term relationship, after dating someone before the party's significant other can sleep overnight at the party's home while the minor children are in the custody of said party.  Both parties agree that significant others shall not be allowed to be alone with the minor children for longer than thirty (30) minutes without the other party present.

The chancery court entered a final decree of divorce for Heaven and Walter on May 27,

---

[1]  We use initials to protect the minors' identities.

[2]  "It was the intention of the legislature in the passage of this adoption act to sever all rights, duties and obligations of the natural parent toward the child adopted, and to bestow those rights, duties and obligations upon the adopting parent just the same as if the child had been born in wedlock to the adoptive parents." *Nat. Mother v. Paternal Aunt*, 583 So. 2d 614, 618 (Miss. 1991) (citing *W.R. Fairchild Const. Co. v. Owens*, 224 So. 2d 571 (Miss. 1969)).

2

2020, affirming the parties' custody, support, and property agreement.

¶4.    Approximately three years later, on July 18, 2023, Heaven filed a complaint for contempt and modification of the custody arrangement.  Heaven alleged there had been "substantial and material changes in circumstances adverse to the best interest of" LD and WD, and she asked for legal and physical custody of both children, "with visitation reserved unto" Walter.[3]  As for the motion for contempt, Heaven alleged that Walter had left a significant other alone with the children longer than the order of divorce's allotted period and had failed to make certain required payments.  Walter filed an answer to Heaven's complaint on August 22, 2023; he also filed a counter-claim for contempt, alleging that Heaven had refused to allow him to see the children consistent with the divorce order's instructed periods.  On September 6, 2023, Heaven filed an answer to Walter's counter-claim.  On November 6, 2023, Walter amended his answer and counter-claim to reflect "multiple reimbursements due to" him from Heaven.

¶5.    On November 6, 2023, Walter filed a motion to appoint a guardian ad litem to the case. On November 20, 2023, the chancery court entered an interim order granting leave for Walter to amend his counter-claim and denying his request for a guardian ad litem.  In addition, the chancellor ruled, "Either party may, at his or her own discretion, demand that

---

[3] In accordance with a change-in-custody arrangement, Heaven also asked for other modifications, such as the ability to claim the children on taxes, holiday visitation, and "a modification of the restriction concerning recreational drugs and/or alcohol to include illegal drugs[.]"

the other submit to a hair follicle drug test."

¶6.     On March 7, 2024, the court held a hearing on Heaven's motion for contempt and custody modification. First, Walter testified adversely, stating that he had commenced a romantic relationship with Heather approximately three years earlier and had been living with her—although they were not married—and her two children for approximately a "year and a half." Heather's children were sixteen and fourteen years old at the time of the hearing. WD stayed with them "part of the time . . . currently" whilst LD was no longer staying there at all.

¶7.     Walter testified that he used marijuana for a "year, maybe two" after separating from Heaven, "[p]robably daily." He admitted to smoking marijuana around the children, but not often. He stated that he had stopped using marijuana "[o]ver a year ago[,]" prior to Heaven's request for custody modification. He bought marijuana "[f]rom friends[,]" whom he knew only by their first names, but later characterized those friends as more of "acquaintances[.]" Of note, Walter stated that from one of those friends, he acquired edibles that had to be refrigerated. Walter stored the edibles in the same refrigerator that his children used but stated they were not within the children's reach.

¶8.     When made aware that LD was cutting himself, despite the parties' custody agreement, Walter allowed LD to live full-time with Heaven in February 2023. Once LD lived with Heaven full-time, she began taking him to therapy sessions with a licensed professional counselor. Walter had not attended any of these sessions but alleged that he

4

conveyed to Heaven that he would have been "happy to go[.]" Prior to LD moving out, he and Walter "didn't spend a lot of time together with just" each other and "kind of ha[d] different interests," and LD "spent a lot of time in his room." Walter acknowledged that while he and Heaven had 50/50 custody of LD, his grades had been mostly Cs, and once LD moved in with Heaven full-time, his grades improved to As. Walter also acknowledged that LD had effectively stopped cutting himself after moving in with Heaven. Walter additionally admitted to missing required payments and allowing WD to be in Heather's presence alone once.

¶9.    LD then testified. At the time of the hearing, LD was sixteen years old and living with Heaven and WD. In February 2023, LD reached out to Heaven to inform her that he had been harming himself and "wanted to go see her." LD explained that he started cutting himself "[b]ecause I felt like I was stupid and I wasn't as important as I actually was and I felt like I wasn't wanted or needed and I was mad at myself, confused." He testified that it was Walter who made him feel that way, "[y]elling, like, loudly in my face," and LD stated that "[t]he only time we would ever talk is when we argued or I wasn't doing good enough in school."

¶10.    LD continued, "I was always getting nagged at, like, about school work and I was trying and I was feeling dumb and it was all confusing around then because everything was changing." LD testified that what upset him about the way Walter spoke to him was "[h]ow he came across" and not saying things like, "let's work on this, he was, like, why aren't you

5

doing this?" LD also testified that Walter used curse words when talking to him, "like the F word and D word and stuff like that." LD stated that after leaving Walter's home, he knew he was welcome to go back but did not want to. When LD went to pick up all of his things a few months after he moved out, he found "everything was put in the driveway[.]" This made LD feel "like, I was kind of being pushed away in a way."

¶11.    LD described Heaven's home as "very clean . . . very well put together[,]" and the family would "all hang out a lot in the living room and watch movies and do, like, stuff together." He also stated that he was more involved in church and extracurricular activities since moving in full-time with Heaven. On the other hand, LD testified that Walter's home that he shared with Heather and her children was "not that clean, it's not very nice and [he would] sit [in my] room by myself and [WD] would sit, like, on the couch or something and watch the iPad[.]" Walter and Heather "would play video games" together, and Heather's children (ZH and TH) would both "sit in their rooms alone, too." Every so often, LD and Walter would go hit balls at a baseball field, "but not very much."

¶12.    LD said he was on the tennis team and testified that Walter had never attended any of his games, while Heaven had attended them all. However, LD did not want Walter to participate in his therapy sessions or attend his extracurricular activity events. LD also stated that he was not interested in seeing Walter or working on their relationship at the time, but that he could be in the future.

¶13.    LD testified that he had a good relationship with WD and that they would "hang out

6

a lot" and that he would "help[] her with her homework."  In other words, he and WD "just have, I mean normal everyday communication."  LD stated that he loved his sister WD and did not want to be separated from her 50/50 anymore.  LD additionally confirmed that he "did not" participate fully in his therapy sessions because he was "not really the person to really open up and talk about stuff" and that he has "held everything back from a lot of people."

¶14.  LD testified that his mother Heaven began dating a man in approximately January 2023, and this upset him.  LD told Walter that he did not want Heaven to date anyone.  This was all around the same time that LD began cutting himself.  LD also stated that Heaven left him alone some nights in order to go out with Cory.  LD testified that he liked and enjoyed being around Cory, Heaven's new boyfriend.

¶15.  Heaven also testified, recounting the time period when LD came to live with her full-time:

> Early in February 2023 I was contacted by Walter concerning a conversation that he and [LD] had regarding self-harming and he and I communicated over the phone about that a good bit before [LD] texting me himself to tell me that was the situation and I offered - - I essentially offered my assistance in any way he needed. I said what do you want me to do that I can best help you? Would you like me to come get you? He agreed. So I then asked Walter if that was okay, if he would meet me with [LD] with his stuff. And then I met them, picked [LD] up and brought him home.

On the day Heaven and LD went to Walter's home to retrieve LD's belongings, she had given Walter "about 20 minutes heads-up" that they were coming.  Heaven stated that upon arriving, "it is clear that Walter is carrying items out belonging to [LD] to the yard and sort

7

of setting them down in the driveway where I had pulled up and parked sort of in a rushed manner, uncomfortable manner."

¶16. Heaven also testified that once she learned LD was harming himself, she sought help from a professional therapist. Heaven confirmed that LD's grades had improved since moving in with her permanently. She also stated that when LD first moved in with her full-time, "he did not appear to look well" and "was about 20-ish pounds lighter than what I'm normally used to seeing him at, give or take." Since the change, however, LD was "a larger kid and definitely healthy-appearing and athletic and things of that nature." At Heaven's home, LD "has a good attitude" and is "laid back, easy going, [a] little goofy, fun to be around, intelligent, [and has a] positive attitude overall." He had also gotten a girlfriend and become more involved in church and sports.

¶17. Heaven described WD as a "bright, intelligent, sassy, fun, hilarious, good-natured, big-hearted little girl[.]" She also related to the chancellor that WD and LD "have a great relationship." Heaven continued:

> They laugh and joke and play and talk and he tries to teach her things. She very much tries to teach him things as well. They are what I could expect to be ideal for that being their age gap. They are close.

Heaven stated that Walter had changed since they had finalized their divorce, "[h]is demeanor and overall attitude toward our children and even to some extent toward myself which is not as of much importance."

¶18. Heaven also confirmed that she and Walter had indeed smoked marijuana together in

LD and WD's presence. She also stated that she had obtained marijuana from Walter and taken it back to her home. Heaven was asked questions concerning LD's therapy session notes and why they did not mention Walter or Heather's children. She simply answered that she "was not privy" to the conversations LD had with his counselor. Following Heaven's testimony, she rested her case.

¶19. Walter first called Heather Harris for testimony. Heather stated that she was in a relationship with Walter and that she has joint custody of her own two children. She and Walter moved in together "around the end of March of 2022." Heather recalled no issues between her children and Walter's children before they moved in together, nor did she recall noticing any issues between Walter and LD. Heather testified that WD and Walter were "always together," and WD "was glued to her daddy."

¶20. Heather could not "pinpoint" exactly when LD and Walter began having problems, but she stated, "[I]t was probably around October, November [2022] when [LD] didn't want to interact as much with anyone in the house and he really just wanted to be with his mother." LD "had made a few remarks that he would rather live with his mother." Heather testified that when Walter would discipline LD, he would "occasionally . . . use a stern[,] louder voice than his normal speaking voice[.]" Heather also noted that once LD began living with Heaven full-time, WD "would say she missed her [brother]."

¶21. Heather reported no issues between her children and Walter's children LD and WD. She stated that before moving in with Walter, they "started every other weekend letting [the

children] hang out." She, Walter, and both sets of children "would either go out to eat, sit and watch movies, play card games, board games, things of that nature." Heather was also questioned about the gender identity of one of her children but testified the child and LD "interacted pretty good," and the child had "a good relationship" with WD even after they all knew of the child's circumstances.[4]

¶22. Walter testified again on his own behalf, largely reiterating facts already established in his earlier testimony. He agreed that his relationship with LD was strained and stated that LD "wasn't talking to me at all after he moved to his mom's." Walter characterized his relationship with LD as a classic "father/son" relationship and stated that they had "differences of opinion on different things but we got along" and spent time together. Walter admitted that he "probably did raise my voice very high, which I have a gruff voice and it can come across as being very mean, you know, even just talking in a normal voice. . . . So it is possible that it came across as being mean to him." Walter said that he had never been contacted or visited by CPS.

¶23. He stated, "[T]here was a period after the divorce and after [Heaven] had moved out she would come over every so often and we would smoke together or I would go over to her house and we would smoke together but I don't remember the last time that happened really." Walter again confirmed that the children were present at those times. Walter also testified

---

[4] One of Heather's children, an assigned female at birth and sixteen-year-old at the time of the hearing, had been diagnosed with gender dysphoria and identified as a male.

that Heaven told him once that LD found some of her marijuana.

¶24.    As for LD, Walter stated:

> I want to have the option to see my son. I want him to come back and live with me 50/50 like it was. I also want to respect his wishes. He's clearly, you know, not at a point that he wants to talk to me right now but I want to get there. You know, if he can't - - if he's not going to come live with me then, as I've said multiple times to his mother and to him, I believe I would be happy to go to, you know, some group therapy, some family therapy with him so we can get to a talking point.

Walter had "tried to reach out to" LD multiple times but either received a "very short, one word" response or no response at all. Walter also reiterated that he had not attended some of LD's extracurricular activities because LD did not want him there. Walter also testified that LD had been cutting himself at both Walter's and Heaven's homes.

¶25.    Since LD left his home, Walter stated that his relationship with WD had not changed and "continues to be great." When asked to describe his relationship with WD, Walter related:

> It's great. I love her to death. She's daddy's girl. I mean, she's with me constantly. From the moment I pick her up from daycare and then we're riding home in the car talking about things.

He also recounted numerous activities he and WD did together, such as building Legos, playing with play dough, and playing video games. Walter also briefly discussed a conflict he had with Heaven prior to her request for custody modification. In short, WD enrolled in tumbling and indicated to Walter that she wanted to stop going. Heaven "insisted" that WD stay in the class "because reasons" that Walter "disagreed with[.]"

11

¶26. In a brief exchange, Walter stated that he and LD "were constantly butting heads on him lying to me." He also admitted to an instance where he told LD "he had a punchable face" but acknowledged "it wasn't my best parenting moment[.]" He also answered questions about conversations he had with Heaven via text message, which were entered into evidence.[5]

¶27. Finally, LD was called in rebuttal. He stated only that his relationship with Walter "was not the best" and they "didn't talk much[.]" But "when we did talk it was either very short or arguing." Walter used "[e]ither a loud tone or just not a very happy tone" when speaking with LD. When asked why he began cutting himself, LD stated explicitly, "[b]ecause how my dad treated me and made me feel."

¶28. On June 6, 2024, the chancellor entered his final opinion and judgment. He found "that there has been a material change in circumstances" which was "adverse to the best interest of the parties' minor children." The chancellor specified that the change was:

> the illegal drug usage by the parties (consuming marijuana in the presence of the children), Walter's storing an amount of marijuana in the family refrigerator that could be toxic to the children, Walter's cohorting with illegal drug dealers, Walter's cohabitation with a woman to whom he is not married, and also the development of a toxic relationship between [LD] and Walter and his response to the situation including cursing, loud outbursts and thinly veiled threats of violence.

Accordingly, the chancellor proceeded to conduct an analysis under *Albright v. Albright*, 437

---

[5] Walter also answered a sequence of questions relating to the *Albright* analysis.

12

So. 2d 1003 (Miss. 1983).[6]

¶29.    An *Albright* analysis requires consideration of the following factors:

(1)    age, health, and sex of the child;
(2)    a determination of the parent who had the continuity of care prior to the separation;
(3)    which parent has the best parenting skills and which parent has the willingness and capacity to provide primary child care;
(4)    the employment of the parent and responsibilities of that employment;
(5)    the physical and mental health and age of the parents;
(6)    the emotional ties of parent and child;
(7)    the moral fitness of the parents;
(8)    the home, school, and community record of the child;
(9)    the preference of the child at the age sufficient to express a preference by law;
(10)    the stability of home environment and employment of each parent; and
(11)    other factors relevant to the parent-child relationship.

*White v. White*, 26 So. 3d 342, 351 (¶28) (Miss. 2010) (citing *Albright*, 437 So. 2d at 1005).

The chancellor found factors such as age, health, and sex of the child, parenting skills, and

moral fitness in Heaven's favor; employment and responsibility in Walter's favor; and

multiple factors as neutral, including physical and mental health and age of parents. After

completing the *Albright* analysis, the chancellor modified the custody arrangement, awarding

Heaven legal and physical custody of LD and physical custody of WD. The chancellor held

that Walter and Heaven would "continue to share the joint legal custody" of WD with

_____

    [6] "Where a party proves that an adverse substantial or material change has occurred, the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Domke v. Domke*, 305 So. 3d 1239-40 (¶16) (Miss. Ct. App. 2020) (quoting *Heisinger v. Riley (Heisinger I)*, 243 So. 3d 248, 256 (¶29) (Miss. Ct. App. 2018)); *see also Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

13

"liberal visitation" rights afforded to Walter. The chancellor also noted that LD "should visit with Walter every other weekend . . . coincid[ing] with the weekend that [WD] is visiting with Walter." In addition, the chancellor held that Heaven would claim both children on her income taxes.

¶30. On June 17, 2024, Heaven filed a motion to amend and/or correct the court's judgment for clarification regarding proof of Walter's life insurance policy and the holiday visitation schedule. On July 3, 2024, Walter appealed.[7] On July 8, 2024, the chancery court entered a supplemental opinion and judgment finding Heaven's motion to amend well-taken and clarifying the holiday visitation schedule and requirement for proof of Walter's life insurance.

## STANDARD OF REVIEW

¶31. "It is well established that this Court's standard of review is limited when analyzing a chancellor's determinations in domestic-relations matters." *Stacy v. Stacy*, 393 So. 3d 1133, 1137-38 (¶12) (Miss. Ct. App. 2024) (quoting *Hardin v. Hardin*, 335 So. 3d 1088, 1092 (¶12) (Miss. Ct. App. 2022)). We will only reverse a chancellor's findings if "the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Id.* Put differently, "[t]he chancellor has the ultimate discretion

_____

[7] On September 12, 2024, Walter filed an unopposed motion to amend the designation of the record to include the record in its entirety and/or supplement the record on appeal. On September 25, 2024, the supreme court entered an order staying briefing and requiring that a "corrected, certified supplemental record" be filed. *See* Order, *Day v. Day*, No. 2024-CA-00771 (Miss. Sept. 23, 2024).

14

to weigh the evidence the way he sees fit." *Riley v. Heisinger (Heisinger II)*, 302 So. 3d 1243, 1255 (¶46) (Miss. Ct. App. 2020) (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003)).

**ANALYSIS**

¶32.   Walter essentially presents two arguments on appeal: (1) whether the chancellor erred by finding there was a material change in circumstances and (2) whether the chancellor misapplied *Riley v. Doerner*, 677 So. 2d 740 (Miss. 1996). To be clear, Walter does not take issue with the chancellor's *Albright* analysis; rather, he argues that the *Albright* analysis should not have been triggered as the chancellor wrongfully found a material change in circumstances.

**I.      Custody Modification**

¶33.   "To modify child custody, the moving party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interest mandates a change of custody." *Domke v. Domke*, 305 So. 3d 1239-40 (¶16) (Miss. Ct. App. 2020) (internal quotation marks omitted) (quoting *Heisinger I*, 243 So. 3d at 256 (¶29)). The moving party "bears the burden of proof by a preponderance of the evidence." *Id.* (quoting *Warner v. Thomas*, 281 So. 3d 216, 222 (¶18) (Miss. Ct. App. 2019)). The chancellor based his decision to modify on three key factors, all of which Walter contests on appeal.

**a.      Drug Use**

15

¶34. Walter contends that the chancellor erred "when he gave weight to the parties' past use of marijuana," and "Walter's past association with people who sold marijuana[.]" In particular, the chancellor noted that Walter "admitted to obtaining marijuana illegally from dealers[.]" The chancellor noted that both Walter and Heaven:

> admitted to using marijuana and storing it where it could have been accessed by the children. Both parties have admitted to ceasing their use of marijuana. The [c]ourt does not base its decision on this issue alone but looks at the totality of the circumstances as they affect both [LD] and [WD].

¶35. Indeed, a chancellor "must consider the totality of the circumstances" when determining whether a "material change of circumstances has occurred." *Id.* at (¶17) (quoting *Heisinger I*, 243 So. 3d at 256 (¶29)). Walter's contention that the chancellor "gave weight" to this factor is correct, as evidenced by the final judgment; however, we do not know how much weight that amounted to, and we further note that the chancellor explicitly stated his decision to modify custody was "not base[d]" on the drug use "issue alone[.]" The testimony from trial shows that Walter freely admitted to purchasing drugs from "friends" and to using drugs. "The chancellor has the ultimate discretion **to weigh the evidence the way he sees fit**." *Heisinger II*, 302 So. 3d at 1255 (¶46) (emphasis added) (quoting *Johnson*, 859 So. 2d at 1013-14 (¶36)). This argument fails.

### b. Cohabitation

¶36. Walter next argues there was no substantial evidence by finding Walter's cohabitation with Heather "constituted a material change in circumstances adverse to the best interest of the parties' minor children[.]" Key to this factor being considered a material change,

16

however, is the fact that Walter and Heaven explicitly agreed in their original divorce agreement "to wait a minimum of six (6) months, a period which shall begin after the party notifies the other of the potential long-term relationship, after dating someone before the party's significant other **can sleep overnight** at the party's home while the minor children are in the custody of said party." (Emphasis added). The agreement did not provide for any sort of arrangement wherein Walter or Heaven could cohabitate with a significant other and his or her family **as an unmarried couple**. Walter argues that such was foreseeable because of the overnight provision and, thus, cannot be considered a material change in circumstances. Indeed, "the material change in circumstances must be unforeseeable at the time of the original decree." *Giannaris v. Giannaris*, 960 So. 2d 462, 469 (¶12) (Miss. 2007) (citing *Lambert v. Lambert*, 872 So. 2d 679, 684 (Miss. Ct. App. 2003)).

¶37.    However, we disagree with Walter's contention that his cohabitation with a significant other and her two children was "foreseeable" at the time the divorce was finalized. An agreement outlining the rules for an overnight guest is not the same as that for a live-in girlfriend with two children of her own. Further, when summarizing the evidence he relied on, the chancellor wrote that LD's patterns of self-harm and isolation did not begin until fall 2022, after Walter and Heather began living together. The evidence also clearly shows that LD's situation improved greatly by moving in full-time with Heaven. This Court reiterates that the chancellor here "has the ultimate discretion **to weigh the evidence the way he sees fit**." *Heisinger II*, 302 So. 3d at 1255 (¶46) (emphasis added) (quoting *Johnson*, 859 So. 2d

17

at 1013-14 (¶36)).  In so doing, the chancellor found Walter's cohabitation with Heather to be a material change with adverse effects on LD.  The record before us gives this Court no reason to reverse that decision.

### c.     Tensions

¶38.    Finally, Walter argues the chancellor erred "when he found that the tensions between Walter and [LD] constituted a material change in circumstances adverse to the best interest of the parties' minor children[.]"  LD asked specifically to live with Heaven full-time.  Walter acknowledged in his own testimony that his relationship with LD was strained.  He admitted that there were times in which he "probably did raise my voice very high" and "it is possible that it came across as me being mean to him."  Walter also admitted he told LD that he had a "punchable face."  He accused LD of "lying" to him frequently. Further, he acknowledged that LD had effectively stopped harming himself and increased his performance in school.

¶39.    LD's testimony evidences more of the same.  He stated explicitly when asked why he began cutting himself, "[b]ecause how my dad treated me and made me feel."  LD described feeling "stupid" and as though he was not "as important" as he actually was.  He stated that his relationship with Walter made him feel "like I wasn't wanted or needed and I was mad at myself, confused."  Again, these feelings led to LD beginning to self-harm.  To begin cutting based on his relationship with his dad is certainly a material change in circumstances.  The record does not contain any evidence from prior to these proceedings that Walter and LD

18

did not get along. The deteriorating relationship between Walter and LD clearly had adverse effects as LD's grades dropped and he began cutting himself due to the rising tension between him and Walter. This Court cannot conclude that the chancellor's decision to find a material change in circumstances partly due to the relationship between Walter and LD was one made without substantial evidence; the record clearly contains substantial evidence supporting such a finding.

## II. Application of *Riley v. Doerner*

¶40. Walter also argues that the chancellor incorrectly applied the law established in *Riley v. Doerner*, 677 So. 2d 740 (Miss. 1996), "with [r]espect to [WD.]" The chancellor's judgment stated that "[a]lthough the record is void of any direct adverse [e]ffect on [WD] at this time, the [c]ourt finds that many of the changed circumstances above, posed a direct threat to her current or future well-being." The chancellor went on to quote the following portion of *Riley*:

> [W]here a child living in a custodial environment clearly adverse to the child's best interest, somehow appears to remain unscarred by his or her surroundings, **the chancellor is not precluded from removing the child for placement in a healthier environment**. Evidence that the home of the custodial parent is the site of dangerous and illegal behavior, such as drug use, may be sufficient to justify a modification of custody, even without a specific finding that such environment has adversely affected the child's welfare. A child's resilience and ability to cope with difficult circumstances should not serve to shackle the child to an unhealthy home, especially when a healthier one beckons.

*Id.* at 744 (emphasis added).

¶41. The *Riley* Court emphasized:

> The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. In particular, it **should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's welfare would be best served by such transfer**.

*Id.* at 744 (emphasis added). "[W]hen the environment provided by the custodial parent is found to be adverse to the child's best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly." *Id.* Crucially, "in all child custody cases, the polestar consideration is the best interest of the child." *Id.* (quoting *Sellers v. Sellers*, 638 So. 2d 481, 485 (Miss. 1994)).[8]

¶42. "There is a preference for keeping siblings together, but the paramount concern is the best interest of the child." *Heisinger II*, 302 So. 3d at 1257 (¶60) (citing *Kimbrough v. Kimbrough*, 76 So. 3d 715, 726 (¶64) (Miss. Ct. App. 2011)). "In essence, the rule from our case law is that **the non-separation of a child from his or her siblings is usually in a child's best interest**." *Id.* (emphasis added) (quoting *Owens v. Owens*, 950 So. 2d 202, 212 (¶35) (Miss. Ct. App. 2006)). Our supreme court has recognized that "a court should in all cases attempt, insofar as possible, **to keep the children together in a family unit**." *McLellan v. McLellan*, 397 So. 3d 860, 868 n.9 (Miss. Ct. App. 2024), *reh'g denied* (Aug. 20, 2024), *cert. denied* 397 So. 3d 497 (Miss. 2024) (quoting *Mixon v. Bullard*, 217 So. 2d

---

[8] *See also Moak v. Moak*, 631 So. 2d 196, 198 (Miss. 1994); *Albright*, 437 So. 2d at 1005.

28, 30-31 (Miss. 1968)).[9]

¶43.    *Riley* was intended "[i]n lieu of the traditional test for modification," allowing courts "on rare occasions [to] apply the adverse environment test[.]" *Kreppner v. Kreppner*, 341 So. 3d 132, 139 (¶48) (Miss. Ct. App. 2022) (citing *Riley*, 677 So. 2d at 745). The *Riley* doctrine has been affirmed numerous times in both this Court and our supreme court. *See Croney v. Solangi*, 328 So. 3d 749, 758 (¶26) (Miss. Ct. App. 2021) (holding that "although [a child] has two loving and capable parents, [the child]'s anxiety and depression would likely improve" if custody were given to a particular parent); *Hoggatt v. Hoggatt*, 796 So. 2d 273, 274 (¶3) (Miss. Ct. App. 2001) (affirming custody modification where a "child's existing situation was detrimental to his emotional and physical health"); *Lackey v. Fuller*, 755 So. 2d 1083, 1089 (¶20) (Miss. 2000) (finding no adverse effects but nonetheless holding "it [was not] in the children's best interest . . . to be shuttled back and forth" between states following one parent's relocation).

¶44.    Also worth noting, "the chancellor, by [his] presence in the courtroom, is **best equipped** to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses."

---

[9]    The supreme court later held that this language was "dicta" but recognized nonetheless that such a presumption in favor of keeping siblings together "expresses a common sense recognition of the ordinary facts of life, **that in the absence of some unusual and compelling circumstance dictating otherwise**, it is not in the best interest of children to be separated." *McClellan*, 397 So. 3d at 868 n.9 (emphasis added) (quoting *Sparkman v. Sparkman*, 441 So. 2d 1361, 1362-63 (Miss. 1983)).

21

*Croney*, 328 So. 3d at 758 (¶25) (quoting *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶56) (Miss. 2003)). Following a hearing, the chancellor found:

> Although the record is void of any direct adverse [e]ffect on [WD] at this time, the [c]ourt finds that many of the changed circumstances above, posed a direct threat to her current or future well-being.
>
> . . . .
>
> Currently, at the time of trial, [WD] was alternating weeks between her parents. To continue this custody arrangement or to award physical custody of her to Walter, **would mean that she is spending the majority of time in a home with children not related by either blood or marriage, while denying her the chance to grow up with her brother**. . . . Therefore, the [c]ourt finds, based upon the totality of Mississippi law at its disposal, that to separate [WD] and [LD] at this time, would not be in [WD]'s best interest.

(Emphasis added).

¶45. The chancellor found—and provided in his final judgment—substantial evidence to support keeping WD and LD together. We see no reason to disturb that decision on appeal. The living environment (Walter's home) that LD and Walter described as having such an adverse effect on LD was the same environment that WD would visit Walter in as well. She observed firsthand the tension and strained relationship between her father and her brother. LD testified to having a close relationship with WD and missing her once he moved in with Heaven full-time. Testimony also showed that WD mentioned missing LD when she was at Walter's house without him. So far as the "preference for keeping siblings together," we see no evidence indicating that keeping WD and LD apart is in the "best interest" of either child.

¶46. Again, the *Riley* decision stated explicitly that custody modification cases were to be

22

decided in a fashion "appropriate to the facts of an individual case." *Riley*, 677 So. 2d at 744. In keeping with such, a chancellor is permitted to transfer custody should his or her judgment show that "the child's welfare would be best served by such transfer." *Id.* This Court finds, with our limited standard of review and the preference for keeping siblings together, no error in the chancellor's decision to keep LD and WD together in Heaven's physical custody.

## CONCLUSION

¶47. Again, "[o]ur standard of review in child custody cases is very narrow." *Hendrix v. Whitt*, 373 So. 3d 778, 787 (¶32) (Miss. Ct. App. 2023) (citing *Hensarling v. Hensarling*, 824 So. 2d 583, 586-87 (¶8) (Miss. 2002)). Crucially, "it is not our role to substitute our judgment for [the chancellor's]." *Id.* (emphasis added). We review only whether the evidence supports the chancellor's decision. Here, the chancellor had plenty of evidence showing a "material change in circumstances" based on Walter's failure to follow provisions set out in the original divorce decree and his growing tensions with LD. The chancellor's decision to keep WD with her brother was also not baseless, as we presume it is in the best interest to keep siblings together. Therefore, we affirm the chancery court's order.

¶48. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR. WEDDLE, J., NOT PARTICIPATING.**